## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Mar 09 2016, 8:49 am
Kevin S. Smith
**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Leanna Weissmann
Lawrenceburg, Indiana

Jeffrey E. Stratman
Aurora, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorney Generals
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

M.S., A.S., C.S., El.S., & Ev.S (Minor Children)

And

S.S. (Mother) and R.S. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioners.*

March 9, 2016

Court of Appeals Case No. 21A01-1505-JT-337

Appeal from the Fayette Circuit Court

The Honorable Beth A. Butsch, Judge

Trial Court Cause No. 21C01-1408-JT-207, 21C01-1408-JT-208, 21C01-1408-JT-209, 21C01-1408-JT-210 & 21C01-1408-JT-211

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, S.S. (Mother) and R.S. (Father) (collectively, Parents), appeal the trial court's Order terminating their parental rights to their five minor children, M.S., C.S., Ev.S., El.S., and A.S. (collectively, Children).[1]

We affirm.

## ISSUE

Parents raise one issue on appeal, which we restate as follows: Whether the trial court's decision to terminate Parents' parental rights to Children was supported by clear and convincing evidence.

## FACTS AND PROCEDURAL HISTORY

Mother and Father are the biological parents of M.S., born August 2, 2007; C.S., born April 10, 2009; Ev.S., born June 10, 2010; El.S., born April 10, 2012; and A.S., born May 24, 2013. On June 9, 2009, M.S. and C.S. were removed from Parents' care after the Department of Child Services (DCS) received a report that Parents refused to allow medical professionals to evaluate C.S. for her sleep apnea and feeding dysfunction. DCS filed its child in need of services (CHINS) petitions. After a DCS investigation, DCS concluded the allegations

---

[1] We note that Parents each filed a separate Notice of Appeal under the same appellate cause number 21A01-1505-JT-337 and filed separate appellate briefs.

against Parents regarding medical neglect and environment life/health endangerment were true. However, M.S. and C.S. were never adjudicated as CHINS and, on September 9, 2009, DCS filed a motion to dismiss. The case was then closed.

[5] On May 19, 2011, Officer Brian Evans (Officer Evans) of the Connersville Police Department received a report that two minors, M.S. and C.S., were found playing "in the middle of an intersection without anyone around." (Father's App. p. 59). When Officer Evans arrived at the scene, a bystander suggested that the minors might live in a two-story white house on Grand Avenue in Connersville, Indiana. The house was a few blocks away from the intersection. Officer Evans located the house and delivered M.S. and C.S. to Parents. Neither Mother nor Father had searched for M.S. and C.S. On June 4, 2011, M.S. was found unsupervised and naked "in the bushes" by funeral home personnel. (Father's App. p. 56). The police officer delivered M.S. back to Parents' residence. Neither Father nor Mother had searched for him.

[6] On August 5, 2012, at approximately 7:14 p.m., Officer Evans received a report that three unsupervised minors, M.S., C.S., and Ev.S., were observed running on the rooftop of their residence. When he arrived at the scene, the officer located the minors on the roof and tried to alert someone inside, but no one answered. Officer Evans "immediately ran to the edge of the roof and attempted to get [the three minors] to [sit down] so they would not fall [off] the roof." (Father's App. p. 61). He also radioed for assistance. At this point, Mother stuck her head out of the window, and the officer ordered her to get the

minors inside the residence. Mother explained that she had just woken up, and she believed Father had taken the three minors to the grocery store. When Father returned home, he informed the officer that he had placed the minors in the upstairs room and had taken the door knob off the door to prevent them from leaving. Father added that he was unsure how they had gotten the window open. Mother was arrested that same day on neglect of dependent charges.[2] The police officers contacted DCS, and DCS initiated a safety plan which allowed a family friend to take all four minors to her home where they stayed until August 9, 2012.

[7]     On August 6, 2012, DCS Family Case Manager Kathy Hobson (FCM Hobson) met with Father at the family's residence. Inside the house, FCM Hobson noticed that several doors were missing door knobs and that there was a padlock on the front door, which took Father several minutes to open. FCM Hobson expressed her concern about having the door padlocked in case of an emergency. Father explained it was suggested by the Riley Autism Treatment Center (Riley Center) to prevent M.S. from leaving. FCM Hobson later verified that the Riley Center never advised Parents to padlock their door. When FCM Hobson visited Mother in jail, Mother's speech was very rapid and hard to follow. Mother would occasionally start speaking in the third person as if she

_____

[2] Both Parents were later charged with neglect of dependents, Class D felonies, and both pled guilty to the charges as Class A misdemeanors on November 30, 2012. Father was sentenced to one year which was suspended to probation on June 14, 2013, and Mother was sentenced to the same term on August 9, 2013.

was not present in the room and then switch between talking without an accent to suddenly having a "very southern" accent. (Transcript p. 503).

[8] FCM Hobson tried to convince Parents to agree to an informal adjustment. Father agreed, but Mother resisted and again spoke at length with FCM Hobson in a confusing way that involved describing the minors in medical terms. Because of Mother's strong resistance, prior multiple incidents of neglect, and the threat of their recurrence, DCS removed all four minors from Parents' care on August 9, 2012.[3]

[9] On August 13, 2012, DCS filed its CHINS petitions for M.S., C.S., Ev.S., and El.S. based on Parents' lack of proper supervision and their criminal neglect charges. DCS found it concerning that Mother spoke about her kids in terms of medical diagnoses and that she exaggerated and fabricated their medical symptoms. As a result of Mother's behavior, M.S. and C.S. underwent numerous medical examinations and tests. Later, at the termination hearing, Mother admitted that she had exaggerated Children's symptoms "to get attention for [herself] to get any kind of attention that [she] could get…" (*Id.* p. 885).

[10] Without any medical evidence, Mother reported that M.S. was autistic, that he needed to be videotaped to determine if he had a seizure disorder, and that he needed a service dog because he was "a flight risk [due to] his behavior." (*Id.* p.

_____

[3] A.S. was not yet born at this time.

472). Mother caused M.S. to be treated with Topamax for possible seizures when there was no record of him having seizures. Even after being told that M.S. did not have a seizure disorder, Mother continued to insist otherwise. Further, M.S. was never diagnosed with autism, instead he was diagnosed with Isodicentric Y Chromosome. Children's maternal grandmother (Maternal Grandmother) later testified that Mother was "always wanting to find out more, see what else could be wrong with [M.S.]" (Tr. p. 704). Due to M.S.'s Y chromosome diagnosis, Mother also asserted that her son had "girl parts" internally. (Tr. pp. 621-22).

[11]    As to C.S., Mother claimed that she had feeding problems. According to Maternal Grandmother's testimony, Mother would place a nasogastric tube in C.S.'s nose to feed her because Mother stated C.S. was not eating enough. However, Maternal Grandmother had never experienced any eating problems with any of the kids. Later, one of the caseworkers observed C.S. eating dry cereal and drinking milk out of a sippy cup without any problems.

[12]    After A.S.'s birth in 2013, Mother attempted to feed A.S. breast milk with a syringe and a plastic tube when she was one month old. Mother told Maternal Grandmother she took the syringe and the tube from the hospital without authorization. After A.S. was placed with Maternal Grandmother, Mother gave Maternal Grandmother some of A.S.'s things, including a vial of medicine which she referred to as "Sweeties." (Tr. p. 699). Mother stated that Sweeties would calm A.S. down if she got upset. Later, Maternal Grandmother learned that the medicine was used to calm infant boys after their circumcision

procedure. Mother told Maternal Grandmother that she took the medicine from the hospital without permission. Finally, Mother was observed wearing scrubs and a stethoscope during one of her hospital visits without any authorization.

[13] In August and September 2012, Parents were referred for behavioral evaluations. After the initial evaluations, the doctor recommended a full psychological and parenting evaluation for Mother because she was suspected to have factitious disorder by proxy.

[14] After a two-day fact-finding hearing, on November 20, 2012, the trial court adjudicated all four minors to be CHINS. On January 11, 2013, the trial court entered its dispositional decree ordering Parents, *inter alia*, to participate in services offered by DCS, to submit to random drug screenings,[4] attend all scheduled visitations, and comply with all visitation rules. The trial court specifically ordered Mother to complete a psychiatric exam to "rule out [factitious disorder by proxy]." (DCS Ex. 37).

[15] On March 26, 2013, Mother completed a psychiatric evaluation with Dr. Susanne Blix (Dr. Blix), an associate professor of clinical psychiatry at Indiana University Medical Center and a qualified expert in the area of factitious disorders. Dr. Blix evaluated Mother and reviewed the records of the four minors. Dr. Blix found that Mother exaggerated or fabricated physical

---

[4] On February 13, 2013, Father failed a drug test and entered treatment for substance abuse.

symptoms for both M.S. and C.S. Mother continued to assert that M.S. had seizures and C.S. had feeding difficulties despite medical evidence otherwise.

[16] Dr. Blix diagnosed Mother with factitious disorder by proxy, also known as Munchausen's syndrome by proxy. Dr. Blix concluded that Mother did not purposefully want to harm her kids, but her longstanding personality traits were unlikely to change. For a change to take place, Dr. Blix explained, a person would need to undergo an intensive therapy to "cognitively" restructure the way the person thinks. (Tr. p. 589). Dr. Blix expressed concern that Mother would again begin to exaggerate and misinterpret symptoms and give her kids medication they do not need for conditions they do not have. As such, Dr. Blix opined that the minors are at "extreme risk for neglect." (DCS Ex. 25).

[17] After A.S.'s birth in May 2013, DCS additionally filed a CHINS petition for A.S. based on Mother's diagnosis of factitious disorder by proxy imposed on another and the other minors' CHINS adjudications. On August 7, 2013, the trial court adjudicated A.S. to be a CHINS, and, on August 23, 2013, the trial court entered its dispositional decree ordering Parents to participate in reunification services.

[18] Since their removal, M.S., C.S., Ev.S., and El.S., have been placed in foster care. All four minors are doing well and are thriving in foster care. At the time of their removal, M.S. and C.S. were both wearing diapers, and C.S. was taking a prescription medicine for incontinence. However, within a month of placement, M.S. and C.S. were both potty trained, and C.S. was eating well.

A.S. was placed with her Maternal Grandmother. A.S. appeared to be well taken care of, and was observed to be a very active and playful infant.

[19] On May 13, 2014, the trial court entered its review orders finding that Mother failed to follow visitation guidelines to ensure Children's safety, and Father made only minimal progress in intervening to correct Mother's inappropriate behaviors. DCS requested the permanency plan changed to adoption, but the trial court declined.

[20] As to their visitations, Parents failed to follow rules on numerous occasions. During their visits, Mother failed to follow specific rules on feeding her Children. Parents failed to maintain discipline and track Children's location. Mother used profanity to calm Children down. Mother was constantly preoccupied with her court hearings or other distractions instead of spending time with her Children. Father's attendance was irregular due to his work schedule. During one of the visits, Mother told Children that they were coming home soon causing M.S. and C.S. to get very angry when it did not happen.

[21] On July 11, 2014, the trial court conducted a permanency hearing. At the hearing, the trial court found that while Parents had complied with the case plan, they had failed to "demonstrate consistent improvement in ability to keep [Children] safe." (DCS Ex. 45). Father had "gained some insight into [Mother]'s factitious disorder but need[ed] to improve his ability to intervene and keep [Children] safe." (DCS Ex. 45). Mother was "inconsistent in following rules regarding child safety during visits." (DCS Ex. 45). The trial

court also found that Mother had "made only partial progress in therapy to address her factitious disorder." (DCS Ex. 45). The trial court changed the permanency plan from reunification to adoption and authorized DCS to file a termination petition.

[22] On August 19, 2014, DCS filed its petitions to terminate Parents' parental rights to Children. On October 28-29, 2014 and February 3, 2015, the trial court held evidentiary hearings. On April 13, 2015, the trial court entered its termination orders as to all five minors.

[23] Parents now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[24] "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive— so we review them with great deference to the trial courts, recognizing their superior vantage point for weighing the evidence and assessing witness credibility." *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). On appeal, our court does not reweigh evidence or judge the credibility of witnesses. *Id.* at 642. Rather, we will only consider the evidence that supports the judgment and any reasonable inferences which may be drawn from that evidence. *Id.*

## II. *Termination of Parental Rights*

"[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied*. In fact, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

The involuntary termination of a parent's rights is not intended to punish the parent; ultimately, it is meant to protect the child. *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013). Termination of parental rights is the most extreme sanction a court can impose, and because it permanently severs a parent's rights to his or her children, it is "intended as last resort, available only when all other reasonable efforts have failed." *Id.* at 1123-24. As such, in Indiana, in order to terminate a parent's rights, DCS must prove, in relevant part:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii)    A court has entered a finding under [Indiana Code section] 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each element by clear and convincing evidence—"a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d at 642 (quoting *In re G.Y.*, 904 N.E.2d at 1260-61 & n.1); *see* I.C. § 31-34-12-2.

## A. *Reasonable Probability of Remedying Conditions*[5]

[27] Parents first argue that DCS did not present clear and convincing evidence to support the trial court's conclusion that the conditions resulting in Children's removal would not be remedied. Because the trial court issued special findings of fact and conclusions thereon, our review is guided by Indiana Trial Rule 52(A). Our court "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). In our review, we first consider whether the evidence supports the factual findings. *C.B. v. B.W.*, 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), *trans. denied*. Second, we consider whether the findings support the judgment. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it relies on an incorrect legal

---

[5] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Indiana Code section 31-35–2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of Children outside the home will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

standard. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.*

[28] Here, as to the first step of our analysis, Parents specifically contend that the following findings were inaccurate:

> 6. Mother reported that [M.S.] was having seizures, which caused [M.S.] to be treated with Topamax for possible seizures for which there was no definite diagnosis. (*State's Exhibit 25*).
>
> * * *
>
> 9. Mother reported to [M.S.]'s foster mother that [M.S.] had "girl parts" internally. (*Testimony from Jill Isaac*[]).
>
> * * *
>
> 13. Mother's diagnosis could potentially impact [Children], making them believe they are ill when they are not. (*Testimony from Dr. Suzanne Blix*).
>
> 14. [M.S.] has demonstrated behaviors of exaggerating his medical condition. For example, [M.S.] has repeatedly asked for cough drops while at school, despite not being ill. [M.S.] has also stated that he needs to go to the hospital for injuries such as a scraped knee or paper cut. (*Testimony from Jennifer Pollitt*).
>
> * * *
>
> 20. Father has stated to [M.S.'s] foster mother that he is not able to parent [Children] by himself. (*Testimony from Jill Isaac[]*).

21. [Children's court-appointed special advocate (CASA)] expressed concerns that Father has not stepped up as the primary caregiver for [Children], but has actually decreased the amount of time he is in the home since the CHINS case was initiated. (*Testimony from Sheri Black*).

(Mother's Br. pp. 6-11; Father's Br. pp. 23-26; Father's App. pp.1422-23) (italics in original).

[29] After careful review of the record, we find that these findings were supported by the evidence. In fact, the trial court cited and italicized the exact source for each of these findings in its order. Parents' arguments basically amount to their explanation of the circumstances surrounding each of these findings, and thus constitute a request for us to reweigh the evidence, which we cannot do. *C.B.*, 985 N.E.2d at 345.

[30] In addition to their objections to the specific findings, Parents generally challenge Findings 2-8, 10-13, and 15-19 of the trial court's order arguing that the trial court improperly considered these facts because they were based on behavior that occurred at least one year prior to the termination hearing. Parents cite to *In re E.M.* to support their claim stating that our supreme court directed the trial courts to "focus on a parent's current behavior and fitness at the time of the termination hearing." (Mother's Br. p. 10; Father's Br. p. 26); *see In re E.M.*, 4 N.E.3d at 642-43. We disagree. A reading of *In re E.M.* clarifies that our supreme court did not stop there, but continued to state that there needs to be balancing of a parent's recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of

future neglect or deprivation." *Id.* at 643. Our supreme court entrusted that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* That is exactly what the trial court did in the present case. In its findings, the trial court not only focused on Parents' behavior shortly prior to the termination hearing, but the trial court also properly took into consideration Parents' historical pattern of conduct, which included multiple instances of neglect and threats to Children's safety. The trial court properly weighed more heavily on Parents' prior history than their recent efforts made in response to the termination proceedings.

[31] Nonetheless, even if we assume that the above findings, given the circumstances surrounding them, were not accurate, it would not necessarily establish reversible error. Parents would still be required to establish that the record contains *no* facts to support the challenged findings either directly or indirectly. *See C.B.*, 985 N.E.2d at 348 (a parent failed to show reversible error; a finding is clearly erroneous only when the record contains no facts to support it directly or by inference). Parents fail to do that.

Our review of the record indicates that Parents were provided with two years of numerous services to improve their parenting skills. However, they failed to demonstrate any substantial and lasting improvements. At the time of the termination hearing, Parents still needed prompting at every visit, Mother continued to struggle with providing supervision and discipline to Children, and Father had not taken the initiative to parent Children in the role of the primary

caregiver, as was necessary to safeguard Children. Furthermore, the evidence reveals that Mother failed to follow visitation guidelines to ensure Children's safety, and Father made only minimal progress in intervening to correct Mother's inappropriate behaviors. While Parents have complied with the case plan, they have failed to demonstrate consistent improvement in their ability to keep Children safe. Father gained some insight into Mother's factitious disorder, but he failed to improve his ability to intervene and keep Children safe. Mother made only partial progress in therapy to address her factitious disorder.

[32] Turning to the second step in our analysis, we conclude that the trial court's extensive findings were sufficient to clearly and convincingly support the judgment. In addition to the trial court specific findings, there were testimonies and recommendations by multiple parties involved in this case. DCS and Dr. Blix remained doubtful that Mother could overcome her factitious disorder. Indeed, Dr. Blix specifically testified that it was unlikely that Mother would change. Dr. Blix clearly stated that because of Mother's factitious disorder, Children were still at extreme risk for neglect.

[33] CASA Sheri Black (CASA Black) expressed her concerns that not only Father had not stepped up as the primary caregiver for Children, but he had actually decreased the amount of time he spent home since the start of the CHINS case. Moreover, FCM Melissa Sparks opined that there was a reasonable probability that Parents would not remedy the reasons underlying Children's removal because Parents had not alleviated the issues of neglect and supervision. While

it is also true that some of the service-providers did not recommend the termination of Parents' parental rights, we reiterate that we only consider those findings that support the trial court's decision. *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 198 (Ind. Ct. App. 2003). Accordingly, we hold that DCS proved by clear and convincing evidence that the conditions which led to Children's removal would not be remedied. *See* I.C. § 31-35-2-4.

### B. *Children's Best Interests*

[34] Further, Parents contend that DCS did not present clear and convincing evidence that termination was in Children's best interests. We are mindful that in considering whether termination of one's parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id.* "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang v. Starke Cnty. Office of Family & Children,* 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied.* "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.,* 904 N.E.2d at 1265. In this vein, we have previously determined that the testimony of CASA regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203; *see also Matter of M.B.,* 666 N.E .2d 73, 79 (Ind. Ct. App. 1996), *trans. denied.*

Here, Parents demonstrated their inability to provide a suitable environment for Children. Parents neglected Children on numerous occasions and placed them in danger. For example, there were several instances when Children were found by the police and returned to Parents. Parents did not attempt to search for the missing children or call the police. There was an incident when Children got on the rooftop and neither parent was aware of that. Parents tried to remedy the conditions, but had very limited success. Moreover, some of their remedies—*e.g.*, removing the door knobs inside their residence and padlocking the front door—were clearly unsafe.

Further, CASA Black testified that despite the fact that "[Children] and [Parents] are bonded, [Children] do need a permanency in their lives and they need safety and assurance … for their future." (Tr. p. 540). CASA Black also stated that the termination of Parents' parental rights would be in Children's best interests. In addition to CASA Black's testimony, service-provider Gwendolyn Brotherton also testified that given Children's ages, it was not in their best interests for permanency to be "put off" any longer. (Tr. p. 662). Therefore, we conclude that the totality of the evidence supports the trial court's decision that termination of Parents' parental rights was in Children's best interests.

C. *Satisfactory Plan for Care and Treatment*

Parents finally claim DCS' adoption plan is not satisfactory because it would rupture the bond between the siblings. Parents argue that it would have "long

lasting effects" on Children. (Mother's Br. p. 22; Father's Br. pp. 36-37). However, they fail to provide any evidence or authority to support their argument. *See* Ind. Appellate Rule 46(A)(8)(a) (each contention must be supported by citations to the authorities, statutes, or the record). As such, Parents waive their argument on appeal. *See also*, *In re Adoption of M.S.*, 10 N.E.3d 1272, 1282 (Ind. Ct. App. 2014) (failure to state a cogent argument results in its waiver on appeal). Waiver notwithstanding, we have repeatedly stated that adoption *is* a "satisfactory plan" for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct App. 2009) (emphasis added). Because Children require permanency and because DCS established a plan for Children's adoption, which would not necessarily involve their complete separation,[6] we find Parents' argument unpersuasive.

## CONCLUSION

[38] Based on the foregoing, we hold that the trial court's termination of Parents' parental rights to Children was supported by clear and convincing evidence.

[39] Affirmed.

[40] Najam, J. and May, J. concur

---

[6] *See, e.g.*, I.C. § 31-19-16.5-1 (allowing postadoption sibling contact).