# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 14 2016, 9:38 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven E. Ripstra
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Karl L. Mulvaney
Nana Quay-Smith
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

David T. McGimpsey
Bingham Greenebaum Doll LLP
Jasper, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Adoption of A.Y.S.: | December 14, 2016 |
| J.S. (Father), | Court of Appeals Case No. 19A04-1606-AD-1439 |
| *Appellant-Respondent,* | Appeal from the Dubois Circuit Court |
| v. | The Honorable William E. Weikert, Senior Judge |
| C.A.K., | Trial Court Cause No. 19C01-1505-AD-9 |
| *Appellee-Petitioner.* | |

**Vaidik, Chief Judge.**

# Case Summary

[1] J.S. (Father) appeals the trial court's order granting the petition of C.A.K. (Stepfather) to adopt Father's daughter. Father argues that the evidence is insufficient to support the trial court's conclusions that his consent was not required and that the adoption was in his daughter's best interests. Finding no error, we affirm.

# Facts and Procedural History

[2] E.J.K. (Mother) and Father were married in February 2004. Father has an extensive criminal record dating back to 1999, including seven felony convictions and nine misdemeanor convictions. *See* Appellant's App. p. 8-10 (General Finding No. 9). He has also struggled with drug addiction. Mother and Father have one child, A.Y.S. (Child), who was born May 13, 2005. Mother and Father separated when Child was about ten months old and then divorced in February 2008. Mother was granted full custody of Child, and Father was given eight hours of supervised visitation with Child each Sunday, which was later increased.

[3] In August 2008, Mother and Child moved in with Stepfather and his two children. Mother and Stepfather later married.

[4] Since Mother and Father's marriage, Father has spent a lot of time either incarcerated, on work release, or on home detention. As a result, Mother has

agreed—on numerous occasions—to modify Father's parenting time with Child in order to accommodate his availability.

[5] In June 2013, Father helped Mother and Stepfather move into a new home in Jasper. Because Father was having marital problems with his then-wife, Mother and Stepfather gave him $600 and offered to let him stay at their house "until he got back on his feet." Tr. p. 81. Father rejected the offer. In the meantime, Father continued his every-other-weekend, overnight parenting time with Child, which he exercised sporadically. *Id.* at 76.

[6] The last time Father saw Child was October 25, 2013.[1] Father came to Mother and Stepfather's home to get Child. Based on Father's recent drastic weight loss and past problems with methamphetamine, Mother and Stepfather were suspicious that Father had been using methamphetamine again. When Mother saw Father that night, she became more convinced that Father was using methamphetamine again. So the following week, Mother called Father's probation officer and requested that he be drug tested. Father tested positive for methamphetamine. Father later admitted to Mother that he had been using methamphetamine but told her that he would make sure that it had "worn off" before seeing Child. *Id.* at 79. Mother thought this plan was "nonsense" since drug users generally cannot control "when you want to use and when you

---

[1] Father claimed that he saw Child after October 25 at a gymnastics class, but Mother disputed this. The trial court resolved this credibility dispute in Mother's favor when it made the following finding: "The last time [Father] was in the presence of [Child] was October 25, 2013 . . . ." Appellant's App. p. 12.

don't." *Id.* Mother was also concerned about the people that Father surrounded himself with. Accordingly, Mother told Father that he could not see Child. She also went to her attorney, who said that he would file a petition to modify Father's parenting time based on his drug use. Mother's petition to modify parenting time was then filed on December 13. *See* Appellee's App. Vol. III, p. 30. A guardian ad litem (GAL) was then appointed. Appellee's App. Vol. II, p. 133.

[7] After October 25, 2013, Father never called to speak with Child. *See* Tr. p. 80 (Mother explaining that she did not "actually" block phone calls from Father after October 25 and that Father could have called Child if he wanted to do so but he did not).

[8] In May 2014, Father was charged with Class B felony dealing in methamphetamine and being a habitual offender; he was jailed on these charges on June 5. The GAL issued her report in August, while Father was in jail awaiting trial. In her report, the GAL explained that she consulted an earlier GAL report regarding these parties:

> I read the July 5, 2011 Guardian Ad Litem Michael A. Fritch's report. The following are excerpts from Mr. Fritch's report:
>
> > [Father] admitted having problems, including drugs, in the past, but says that he is clean and plans to remain that way . . . .
> >
> > In a nutshell, the problem with [Father] resuming visitation with [Child] is that he has a horrible track

record. Not with any issues of abuse, but simply that he doesn't stay out of trouble with the law very long before he is either arrested again, or put back in jail because of a violation of Community Corrections or probation. Because of this, he has spent little time with [Child], and [Child], at her young age, has become predictably estranged and disenchanted with her father. [Father], of course, claims his problems are in the past, and the environment within which he now lives is positive and healthy.

* * * * *

It is now three years later and Father again finds himself incarcerated facing serious criminal charges with significant time to serve if found guilty. Father is currently not involved in [Child's] life as he is sitting in the Dubois County Security Center.

Father's criminal history spans fifteen (15) years . . . . The current situation is similar to three years ago; however, this time Father is incarcerated and has serious criminal charges pending against him. [Child] is nine (9) years of age. . . . She knows that [Father] comes in and out of her life. Father is not receiving any parenting time since he is incarcerated and he last received parenting time in November 2013. In the event[] Father bonds out of jail or receives some type of pre-trial detention (such as work release or home detention), I would recommend that Father not have parenting time with [Child] until his pending criminal charges and any motions to revoke his probation are resolved. In my opinion, any future parenting time recommendations for Father will depend on: the outcome of his pending criminal matters, his rehabilitation, how much time has passed since he last saw [Child], [Child's] age and development, and other pertinent factors that exist at that time.

Appellee's App. Vol. III, p. 49-50.

[9] A month after the GAL filed her report, Father pled guilty to Class B felony dealing in methamphetamine and was sentenced to ten-and-a-half years. Father's earliest possible release date is June 1, 2018.

[10] Stepfather filed a petition to adopt Child on May 12, 2015. After Stepfather filed the adoption petition, Father sent letters to Child from prison. According to Father, he also sent a few letters to Child before Stepfather filed the adoption petition; however, Mother claimed she never received these letters.

[11] The trial court held a hearing on Stepfather's adoption petition. At the time, Father was nearly $20,000 behind in child support. In May 2016, when Child was eleven years old, the trial court issued an order granting Stepfather's petition to adopt Child, finding that (1) Father's consent to the adoption was not required because for a period of at least one year he failed without justifiable cause to communicate significantly with Child although he was able to do so and (2) the adoption was in Child's best interests. The court concluded, in relevant part:

> In our case, the best evidence favoring [Father] was that he sent 3 letters to the daughter during the one year period [before the adoption petition was filed], made no phone calls to her, and was $19,996.00 in arrears in child support.
>
> The Court's conclusion is that during the one year period before the filing of the petition for adoption, while [Father] was in prison, he could have done his part in having a significant

communication by writing his daughter and sending her gifts. He did not do so.

* * * * *

[I]t is the Court's opinion that it definitely is in [Child's] best interest to grant the petition for adoption. These facts are:

1. It is [Stepfather] who has provided shelter, clothing and food for the last 8 years. [Father] is $19,966.00 in arrears in child support.

2. It is [Stepfather] who has helped [Child] with her homework all these years and has been the de facto father.

3. It is [Stepfather] who has loved [Child] like a father should love his child. [Father] has been absent.

4. It is [Stepfather] who has always been there for [Child], and not [Father] who has spent much of [Child's] life committing crimes, being in jail or prison, or on Community Corrections programs.

5. The GAL report of 2011 and the GAL report of 2014 both stated how [Father] has always promised to do better, not get in any trouble again in order to be a responsible father. He has again failed as he now sits in prison serving a long term.

6. [Child] deserves some consistency, continuity and love from a father figure. It is [Stepfather] who has provided all these important ingredients for [Child] over the last 8 years, not [Father].

Appellant's App. p. 17, 25.

[12] Father now appeals.

# Discussion and Decision

[13] Father contends that the trial court erred in granting Stepfather's petition to adopt Child. He argues that the evidence is insufficient to support the trial court's conclusions that his consent was not required and that the adoption was in Child's best interests.

[14] Our standard of review in adoption cases is well established.[2] When reviewing adoption proceedings, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption. *In re Adoption of O.R.*, 16 N.E.3d 965, 972-73 (Ind. 2014). We generally give considerable deference to the trial court's decision in family-law matters, because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, "get a feel for the family dynamics," and "get a sense of the parents and their relationship with their children." *Id.* at 973 (quoting *MacLafferty v. MacLafferty,* 829 N.E.2d 938, 940 (Ind. 2005)). We will not disturb the trial court's ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. *Id.*

---

[2] Father asks us to modify this standard of review. *See* Appellant's Br. p. 14. We decline his invitation.

When, as in this case, the trial court has made findings of fact and conclusions, we apply a two-tiered standard of review: we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). Factual findings are clearly erroneous if the record lacks any evidence or reasonable inferences to support them,[3] and a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses, and we examine the evidence most favorable to the trial court's decision. *O.R.*, 16 N.E.3d at 973.

# I. Consent

Generally, a petition to adopt a minor child may be granted only if written consent has been provided by the biological parents. *See* Ind. Code § 31-19-9-1. However, written consent is not required from, among others, the following:

> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
>> (A) fails without justifiable cause to communicate significantly with the child when able to do so . . . .

---

[3] Father quotes three pages of findings that he claims are "not supported by the evidence." *See* Appellant's Br. p. 12-14. However, because he makes no argument other than this bald assertion, we do not address the findings individually.

Ind. Code § 31-19-9-8(a).[4]  The petitioner for adoption must prove this statutory criterion by clear and convincing evidence.  *See T.L.*, 4 N.E.3d at 662 n.3.

[17]  The test for communication is not whether the noncustodial parent had **no** communication with the child, but whether he failed without justifiable cause to have **significant** communication when able to do so.  *In re Adoption of S.W.,* 979 N.E.2d 633, 640 (Ind. Ct. App. 2012).  The purpose of this statutory provision is to foster and maintain communication between noncustodial parents and their children, not to provide a means for parents to maintain "just enough contact" to thwart potential adoptive parents' efforts to provide a settled environment to the child.  *Id.*  Accordingly, the noncustodial parent must make more than a "token effort" to communicate with the child.  *In re Adoption of C.E.N.*, 847 N.E.2d 267, 272 (Ind. Ct. App. 2006).

[18]  Here, the record shows that the last time Father saw or spoke to Child was October 25, 2013; Father was incarcerated on June 5, 2014; and the adoption petition was filed on May 12, 2015.  Thus, Father had no contact with Child

---

[4] Here, the trial court found that another statutory provision applied to Father.  Indiana Code section 31-19-9-8(a)(1) provides that consent is not required from a parent if the child is adjudged to have been abandoned or deserted for at least six months immediately preceding the date of the filing of the adoption petition.  "However, the statute is written in the disjunctive such that the existence of any one of the circumstances provides sufficient ground to dispense with consent."  *O.R.,* 16 N.E.3d at 973.  Because we conclude that the trial court properly relied on Indiana Code section 31-19-9-8(a)(2)(A)— namely, that for a period of at least one year Father failed without justifiable cause to communicate significantly with Child although he was able to do so—we do not address the other provision the trial court relied on.

between October 25, 2013, and his incarceration on June 5, 2014—a period of over seven months.

[19] As for the fact that Father was incarcerated from June 5, 2014, until the adoption petition was filed on May 12, 2015—a period of over eleven months— the trial court found that he still could have had meaningful contact with Child by sending her letters or gifts. *See* Appellant's App. p. 13 (Finding No. 18: "[T]here was no one keeping [Father] from writing to his daughter on a regular basis while he was in prison. He could have sent her birthday cards or cards or gifts at Christmas and other holidays. He did not."). The court noted that while Father was incarcerated and before the adoption petition was filed, he mailed only three letters to Child, which Mother never received. *See id.* at 14 (Finding No. 19(o): "The most favorable evidence for . . . Father was that he mailed Exhibits C, D and E prior to the filing of the petition for adoption. . . . [Mother] denied ever getting any of these. . . . [T]he Court believes [Mother] when she said she did not receive Father's C, D and E."). To the extent Father claims that Mother destroyed letters from Father, this is simply a request for us to reweigh the evidence. Finally, Father claims on appeal that Mother was uncooperative in his efforts to see Child. However, the trial court, noting that Mother agreed on at least five occasions to modify Father's parenting time because of his criminal behavior, specifically rejected this claim. *See id.* at 16 (Finding 20(b)(ix): "This record does not reflect a mother who was uncooperative. In fact, she was very cooperative, while at the same time trying to protect her daughter from the dangers in which [Father] often found himself.

The Court does not give any credibility to [Father's] contention that [Mother] was uncooperative with him regarding parenting time.").

[20] In sum, in the eighteen months leading up to Stepfather's filing of the adoption petition, Father did not see or speak to Child and mailed her only three letters (which Mother never received). Although Father was incarcerated for a large part of this time (and remains incarcerated today), there was nothing that prevented him from sending letters to Child on a more regular basis. We therefore find that Stepfather has proven by clear and convincing evidence that for a period of at least one year, Father failed without justifiable cause to communicate significantly with Child when able to do so. *See O.R.*, 16 N.E.3d at 973-75 (holding that incarcerated father failed without justifiable cause to communicate significantly with his daughter by calling her only once in six years and not attempting mail communication with her through the adoptive parents or the court); *In re Adoption of E.A.*, 43 N.E.3d 592, 598-99 (Ind. Ct. App. 2015) (holding that incarcerated father failed without justifiable cause to communicate significantly with his son by sending mother a few letters in which his son was mentioned and by sending his son a birthday card on his second birthday and by not sending any communication for two years), *trans. denied*; *cf. Lewis v. Roberts*, 495 N.E.2d 810, 813 (Ind. Ct. App. 1986) (holding that incarcerated parent communicated significantly with his daughter by writing her weekly and seeing her every other week during the first nine months of his incarceration and thereafter writing her two to three times a year and

sending her cards and gifts at Christmas, Easter, and birthday). Accordingly, Father's consent to adopt Child was not required.

## II. Best Interests

[21] Even if a court determines that a biological parent's consent is not required for an adoption, the court must still determine whether adoption is in the child's best interests. Ind. Code § 31-19-11-1(a); *O.R.*, 16 N.E.3d at 974. Father appears to argue that adoption is not in Child's best interests because he has bettered himself since he has been in prison this time. *See* Appellant's Br. p. 17.

[22] The adoption statute does not provide guidance for which factors to consider when determining the best interests of a child in an adoption proceeding, but we have noted that there are strong similarities between the adoption statute and the termination-of-parental-rights statute in this respect. *In re Adoption of M.S.*, 10 N.E.3d 1272, 1281 (Ind. Ct. App. 2014). In termination cases, we have held that the trial court is required to look to the totality of the evidence to determine the best interests of a child. *Id.* Relevant factors include, among others, a parent's historical and current inability to provide a suitable environment for the child; the recommendations of the child's case worker or guardian ad litem; and the child's need for permanence and stability. *Id.* at 1281-82.

[23] Here, the record shows that Father has sixteen convictions (seven felonies and nine misdemeanors), ten since Child was born. As a result, he has been incarcerated for "much" of Child's life and continuously since June 5, 2014.

Appellant's App. p. 24. In fact, he will be incarcerated until at least June 1, 2018, at which point Child will be a teenager. Because of his convictions, Father has not been able to keep up with his child-support payments and was nearly $20,000 in arrears at the time of the hearing in this case. As the trial court found, "[Child] has been disappointed all her life because [Father] would promise to stay out of trouble and be a father, only to be followed with more episodes of incarceration." *Id.* In the meantime, since Child was three years old, Stepfather has been acting as Child's father by providing her with food, shelter, clothing, love, and support. The trial court recognized that Father claimed to have learned his lesson this time; however, the court noted that he told the GAL this very same thing back in 2011: "Despite the possible good intentions of [Father], he has failed time and again as a father." *Id.* Accordingly, the court concluded that Child deserved the "consistency, continuity and love" that Stepfather has provided over the past eight years. *Id.* at 25. The trial court did not err in determining that adoption was in Child's best interests. Accordingly, the court did not err in granting Stepfather's petition to adopt Child.

Affirmed.

Bradford, J., and Brown, J., concur.