**FOR PUBLICATION**



ATTORNEY FOR APPELLANT:

**DAVID W. STONE IV**
Stone Law Office & Legal Research
Anderson, Indiana

ATTORNEY FOR APPELLEE:

**BRIDGETTE F. GREENE**
Elkhart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION | ) | |
| OF M.S.; | ) | No. 20A03-1306-AD-217 |
| | ) | |
| C.L.S., | ) | |
|     Appellant/Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A.L.S., | ) | |
|     Appellee/Petitioner. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable David C. Bonfiglio, Judge
The Honorable Dean O. Burton, Magistrate
Cause No. 20D06-1112-AD-12

**June 13, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

C.S. ("Mother") appeals the trial court's order granting A.S.'s ("Stepmother") petition to adopt Mother's minor daughter, M.S.

We affirm.

ISSUE

Whether the trial court erred in granting Stepmother's petition to adopt M.S.

FACTS

Mother married Mi.S. ("Father") and had two children with him—M.S. and J.S. M.S. was born in July of 2003 and was nine years old at the time of the adoption hearing.[1]  Shortly after M.S.'s birth, on August 14, 2003, Mother filed for dissolution of her marriage to Father.  The Elkhart Superior Court 1 ("divorce court") approved a decree of dissolution on January 29, 2007, and granted Mother custody of the children.

After a visitation hearing on April 9, 2009, Mother and Father both submitted to drug screens.  Father's results were negative, but Mother tested positive for marijuana, methamphetamines, and amphetamines.  As a result, on April 13, 2009, the divorce court entered a finding of direct contempt of court against Mother and granted Father custody of both children, although it granted Mother supervised visitation with the children at Child and Parenting Services ("CAPS") three times per month.  The divorce court also ordered Mother to pay child support in the amount of $50.00 per week, effective April

---

[1] J.S. was nineteen at the time of the adoption hearing, but only the adoption of M.S. is at issue in this case.

17, 2009, and directed her to schedule an addictions assessment and to complete any recommended treatments for her addictions.

Following the divorce court's April 13, 2009 order, Mother participated in a few supervised visits with the children at CAPS. However, at an October 30, 2009 hearing, Mother again tested positive for marijuana, and the divorce court terminated her visitation rights. Mother has not had personal contact with M.S. since that time, although she left messages on the voicemail of M.S.'s guardian ad litem at CAPS, Mary Raatz ("Raatz"), telling Raatz that she wanted to see M.S. However, Raatz felt that Mother had not demonstrated that she had completed the addictions assessment or treatment the divorce court had ordered her to complete before she could resume visitation. At a review hearing on February 12, 2010, Mother requested the divorce court to reinstate parenting time, but the court denied the request. Otherwise, Mother has not made any attempts to reinstate parenting time or contact with M.S.

With respect to her court-ordered services, Mother completed an addictions assessment at the Center for Problem Resolution ("CPR") on November 17, 2009. CPR recommended inpatient treatment with a program called Women's Journey and agreed to provide Mother with outpatient treatment until she could be admitted to the program. Mother completed a phone assessment for Women's Journey but did not meet the program's criteria for admittance because she denied having an addiction problem. Thereafter, Mother attended two treatment sessions at CPR. After her second session, she claimed to be ill for multiple sessions but was unable to provide a doctor's note verifying her illness, even though CPR had referred her to a free medical clinic. Mother

3

never attended another session or contacted the program again, and on December 21, 2009, CPR discontinued her treatment with an "unsatisfactory discharge." (Ex. 6).

During this time, Mother was self-employed and lived in a seven bedroom home with a $1600 per month mortgage payment. To help pay for the mortgage, Mother rented out rooms and ran a dog boarding and grooming business at the residence. However, the residence was ultimately foreclosed, and Mother was forced to close her dog boarding and grooming business.

Beginning in October of 2010, before the property was foreclosed, Mother's mother ("Grandmother") began making payments to cover the residence's mortgage. She also helped Mother consolidate her bills and pay back her debts by opening an account with a credit consolidation company, Elite Financial. Every month Grandmother paid Elite Financial, and in turn Elite Financial allocated money to Mother's various debts and bills. In exchange for Grandmother's payments, Grandmother wanted Mother to "rebuild her life." (Tr. 303).

Mother also began working for Grandmother's company, All Needs Senior Service, on a flexible basis, and her income from this work went to Elite Financial and to repay Grandmother. Mother's hours at All Needs Senior Services fluctuated—in part from the nature of her work, which was on a per-project basis, and in part because Mother suffered medical issues that limited her ability to work during periods of 2011. When Mother was suffering from her medical issues, she worked to the extent she was able, including up to fifteen to twenty hours per week while she was hospitalized. Although Mother's hours varied, Grandmother thought that Mother began "productively

4

working" towards the end of 2011, by which Grandmother meant that Mother was able to begin repaying the money Grandmother had spent on her behalf. (Tr. 309).

In April of 2011, Grandmother purchased a home for Mother on a land contract, and Mother moved from Bristol, Indiana to Cassopolis, Michigan to live in the home. Grandmother made a down payment of $5000 on the house and thereafter paid $468.86 per month for its mortgage. In addition, Grandmother gave Mother money to remodel the house, and Mother did "quite a bit of work" towards that end. (Tr. 189). Grandmother also gave Mother a dog, a cat, and two horses and pays to maintain them.

Meanwhile, in 2010 and 2011, Mother was convicted of a felony and violated her probation for the felony. On February 16, 2010, the State charged Mother with: (1) Class D felony possession of chemical reagents or precursors with the intent to manufacture a controlled substance; (2) Class A misdemeanor possession of marijuana; and (3) Class A misdemeanor possession of paraphernalia. On June 10, Mother pled guilty to Class D felony maintaining a common nuisance pursuant to a plea agreement, and the Elkhart Superior Court 6 ("criminal court") sentenced her to eighteen (18) months of probation. Subsequently, on August 5, 2011, the criminal court found that Mother had violated her probation by committing Class B misdemeanor cruelty to an animal. As a result, on September 7, 2011, the court revoked her probation and placed her in Community Corrections. However, on September 29, 2011, the court authorized Mother to take a furlough from her sentence due to her medical condition. On March 5, 2012, Mother's sentence was modified to community corrections on ankle bracelet monitoring, and Mother completed her sentence on October 14, 2012.

Throughout the time that Father maintained custody of M.S., from 2009 until 2013, Mother made inconsistent child support payments. In October of 2009, Mother filed a type-written minute sheet petitioning the divorce court for a modification of its child support order. The divorce court held a hearing on the petition but did not modify Mother's child support obligations. Instead, it determined that her child support arrearage totaled $1,150. Subsequently, Mother paid her child support sporadically from October 29, 2009 until September 17, 2010 in nine payments, totaling $1,400. After September 17, 2010, she did not make any more payments in 2010 and made only one payment of $300 on January 12, 2011. Thereafter, she did not make another payment until January 18, 2012, over a year later. On January 18, she paid $100. After January 18, she made twenty-three additional payments of $70.00 each in 2012 and one payment of $70.00 at the beginning of 2013.[2]

On June 11, 2011, Father married Stepmother. Approximately six months later, on December 12, 2011, Stepmother filed a petition to adopt M.S. In the petition, Stepmother argued that Mother's consent was not required for the adoption because she had failed to support M.S. for over a year and had failed to communicate with M.S. for at least a year prior to the petition. On February 29, 2012, Mother filed an amended motion to contest the adoption. The trial court held a hearing on the petition on January 9, 2013 and February 25, 2013, and then took the matter under advisement.

---

[2] The child support payment history that is a part of the trial record only details the payments Mother made prior to January 9, 2013.

Subsequently, on May 20, 2013, the trial court found that Mother's consent was not required for the adoption and granted Stepmother's petition because: (1) Mother failed to pay support for at least one year; (2) Mother failed to communicate with M.S. for at least one year; and (3) the adoption was in M.S.'s best interests. With respect to the issue of whether Mother had failed to support M.S. for over a year, the trial court aggregated the amount of support Mother owed prior to January 12, 2011,[3] which it found totaled $2,900—the sum of the $1,150 in arrearage Mother had accrued prior to October 30, 2009; $950 in arrearage for the period between October 30, 2009 and September 17, 2010; and $800 in arrearage for the period between September 17, 2010 and January 12, 2011. The trial court divided this total by Mother's required weekly support amount of $50 and determined that she had not paid support for a total of fifty-eight weeks, or just over one year.

Although the trial court concluded that Mother had not paid support for over a year, it noted that there is a statutory allowance for situations when there is a justifiable cause for the lack of support. Still, the trial court did not find that this allowance applied to Mother. It commented that Mother's claims that her illness and the loss of her pet grooming business prevented her from paying support were "simply not well taken" in light of the fact that Mother had maintained gainful employment; had lived on land purchased by Grandmother in a large house where she rented out rooms; and had subsequently lived in another home purchased by Grandmother. (App. 12). The trial

---

[3] It is not clear why the trial court limited its analysis to the support Mother owed prior to January 12, 2011, and did not include her missed payments after that date.

7

court also noted that it found much of Mother and Grandmother's testimonies regarding Mother's income "evasive." (App. 13). It also stated that it did not find Grandmother's system of equating her payments with Mother's work credible. Finally, the trial court commented that Mother maintained "animals which she cared for and paid to keep, including dogs, a cat and a horse,"[4] during a time when she was paying little or no child support. (App. 13). Based on these factors, the court held that, even in recognition of the times Mother had suffered medical hardships, there was no evidence to demonstrate that she could not make the required support payments—especially during the time period before her medical hardships.

With respect to the issue of whether Mother had failed to communicate with M.S., the trial court found that even though Mother's lack of contact was court-ordered, the order was based on Mother's repeated drug screen failures and non-compliance with court orders. Therefore, the divorce court's suspension of Mother's parenting time was a result of her own choices and did not excuse her lack of communication. Likewise, the trial court noted that after the divorce court denied Mother's request for parenting time on February 8, 2010, she never again sought parenting time. Although her reason for failing to seek parenting time was that her attorney had advised her she needed to clear up criminal matters first, the criminal matters were a result of her own actions. Accordingly, the trial court held that it was again Mother's choices that prevented her from resuming

---

[4] Although this does not change the import of the trial court's reasoning, we note that Mother testified she owned a dog, a cat, and two horses, rather than "dogs, a cat, and a horse." (App. 13).

parenting time. Based on this conclusion, the trial court found that that Mother's consent was not required for the adoption.

Finally, the trial court found that the adoption was in M.S.'s best interests because she has thrived under Stepmother's care and sees her as a maternal figure. The trial court noted that the testimony that M.S. and Stepmother have a "really close" relationship was credible, and the court also commented that Stepmother provides M.S. with a stable environment because she has full time employment, does not have a criminal history, and has a sound relationship with Father. In light of these factors, the trial court determined that the adoption was in M.S.'s best interests and granted Stepmother's petition. Mother now appeals the trial court's order. We will provide additional facts as necessary.

## DECISION

On appeal, Mother challenges the trial court's judgment granting Stepmother's petition to adopt M.S. without her consent. Generally, a trial court may only grant a petition to adopt a child born in wedlock who is less than eighteen years of age if "each living parent" consents to the adoption. IND. CODE § 31-19-9-1. However, INDIANA CODE § 31-19-9-8 provides that consent to an adoption is not required from:

> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

9

The trial court held that both of these provisions applied to Mother because she had failed to pay the equivalent of over fifty-eight weeks of her court-ordered child support payments and failed to communicate with M.S. for at least a year.

Mother challenges both of these conclusions, arguing that: (1) the trial court erred in holding that she had failed to support M.S. for over a year because the trial court improperly aggregated her arrearage so that it was equivalent to a year of missed support payments, whereas the trial court should have determined whether she had failed to pay support for a consecutive calendar year; (2) the trial court erred in finding that she had the ability to pay support and chose not to do so; and (3) the trial court erred in finding that she had failed to communicate with M.S. because a court order prevented her from communicating. Finally, Mother also argues that the trial court erred in determining that Stepmother's adoption was in M.S.'s best interests. Because we find that the trial court properly determined that Mother had failed to provide support to M.S., we will not address Mother's argument regarding her failure to communicate with M.S. However, we will address Mother's arguments regarding her child support payments and M.S.'s best interests, in turn.

I. Child Support

There are two components to Mother's child support argument. First, she argues that the trial court erred when it determined that she had failed to support M.S. for a year, because she contends that the term "year" in INDIANA CODE § 31-19-9-8 should mean a calendar year rather than a year's worth of arrearage. Second, she argues that even if she did not support M.S. for a year, INDIANA CODE § 31-19-9-8 only applies to parents who

10

are "able to do so," and she was not financially able to provide support. *See* I.C. § 31-19-9-8-2(B).

In an adoption proceeding, the petitioner is required to prove by clear and convincing evidence that a non-custodial parent's consent is not required for the adoption. *In re Adoption of K.S.*, 980 N.E.2d 385, 388 (Ind. Ct. App. 2012). In reviewing a judgment requiring proof by clear and convincing evidence, we may not impose our view as to whether the evidence is clear and convincing but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence. *In re Adoption of M.A.S.*, 815 N.E.2d 216, 220 (Ind. Ct. App. 2004). Further, we may not reweigh evidence or assess witness credibility. *Id.*

A. *Aggregation of Missed Support Payments*

In support of her argument that a trial court may not aggregate missed support payments to find that a parent has failed to support his or her child for over a year, Mother cites to authority from other jurisdictions, including Montana and Colorado. However, we need not address Mother's argument because even if we were to interpret "year" to mean a continuous calendar year, Mother still failed to support M.S. for over a year. In *In re Adoption of J.T.A.*, which Mother cites for a different purpose, we held that "the relevant time period" for determining whether a non-custodial parent has supported his or her child, "is not limited to either the year preceding the hearing or the year preceding the petition for adoption, but is *any year* in which the parent had an obligation

11

and the ability to provide support, but failed to do so." *In re Adoption of J.T.A.*, 988 N.E.2d 1250, 1255 (Ind. Ct. App. 2013) (emphasis added), *reh'g denied*, *trans. denied*. Here, Mother failed to pay support between January 12, 2011, and January 18, 2012, which is a period longer than a calendar year.

Moreover, this decision is in line with the Indiana Supreme Court's opinion in *Adoption of Infants Reynard*, where the Supreme Court interpreted the issue of consent in a prior version of the adoption statute and held that the term "one year" should not be interpreted strictly. *See In re Adoption of Infants Reynard*, 251 N.E.2d 413, 416 (Ind. 1969). The statute at issue in *Adoption of Infants Reynard* was similar to the current adoption statute. It stated that consent was not required from any parent that "ha[d] failed to pay any support money for a period of one year. . . ." *Id.* The Supreme Court addressed whether a parent's "token payment" of $75.00 during the year immediately prior to the filing of the petition for adoption was sufficient to comply with the terms of the statute and thus necessitate the father's consent. *Id.* The Supreme Court held that this payment was not sufficient, in spite of the fact that it was made in the calendar year prior to the petition. *Id.* The Court's reasoning was:

> In construing the statute here under consideration which dispenses with consent in adoption proceedings under certain conditions, we are mindful of [the natural right of the parent to his child], but we do not propose to give the statute such a strict interpretation as to make it ineffective and inoperable. To hold that under the statute there must be a complete refusal or failure to pay any sum whatever for one year before consent would be dispensed with would be to disregard completely the obligation which a parent has to provide support and maintenance for his child. Such a holding would permit an unworthy parent, in complete disregard of his obligation to his child, to prevent an adoption which might be to the best interest of the child by making a token payment of a nominal sum once

12

each year insufficient to provide for maintenance and support. Such a strict construction would lead to absurd consequences and make the statute meaningless and ineffective.

*Id.* at 417. Likewise, we find that construing INDIANA CODE § 31-19-9-8 here to hold that there must be a complete refusal or failure to pay any sum of money for one year before the filing of a petition could lead to absurd consequences. Therefore, we instead follow the Supreme Court's more operable interpretation.

Under this interpretation, Mother failed to provide sufficient support for M.S. Between September 17, 2010 and January 18, 2012, she only made one payment of $300. While this amount exceeds the $75.00 payment in *Adoption of Infants Reynard*, it is only equivalent to six weeks of Mother's support payments, and it is the only payment Mother made over a period of one year and four months. In this light, it is clear that the $300 was "insufficient to provide for [M.S.'s] maintenance and support." *See Adoption of Infants Reynard*, 251 N.E.2d at 417.

B. *Ability to Pay*

Although Mother failed to support M.S., INDIANA CODE § 31-19-9-8 specifies that consent is only unnecessary for an adoption petition when a parent "fails to provide for the care and support of the child *when able to do so*." (Emphasis added). Mother points to the second half of this provision and contends that she was not able to provide support due to the loss of her pet grooming and boarding business and her medical issues.

In this Court's opinion denying rehearing in *In re Adoption of Augustyniak*, 508 N.E.2d 1307, 1308 (Ind. Ct. App. 1987), *reh'g denied*, *trans. denied*, we held:

13

A petitioner for adoption must show that the non-custodial parent had the ability to make the payments which he failed to make. This ability cannot be adequately shown by proof of income standing alone. To determine that ability, it is necessary to consider the totality of the circumstances. In addition to income, it is necessary to consider whether that income is steady or sporadic and what the non-custodial parent's necessary and reasonable expenses were during the period in question.

Here, Mother claims that she spent $30,000 on medical expenses and also suffered financially due to the loss of her business. The trial court noted, though, that Mother maintained consistent gainful employment, first through her business, and then as an employee for Grandmother's senior care business. While Mother's hours varied, she was paid $10.00 to $12.00 per hour and even worked fifteen to twenty hours a week while she was hospitalized. Moreover, Mother was able to live in a house purchased and paid for by Grandmother, redecorate that house, and support multiple pets. The trial court concluded that "substantial monies were spent on the home that could have been directed towards child support." (App. 12). The trial court also stated that it found Mother and Grandmother's testimonies regarding Mother's income "evasive" and "lack[ing] some credibility." (App. 13). Finally, the trial court commented that, even though Mother had medical expenses, her illness did not account for why she had failed to provide sufficient support prior to August of 2011. As we may not reweigh the evidence or judge the credibility of witnesses, we conclude that this evidence is clear and convincing proof that Mother did not support M.S. when able to do so. As a result, we conclude that the trial court did not err in determining that Mother's consent was not required for the adoption.[5]

---

[5] Mother also challenges the trial court's conclusion regarding the first prong of INDIANA CODE § 31-19-9-8, that she failed without justifiable cause to communicate significantly with M.S. when able to do so. However, the provisions of INDIANA CODE § 31-19-9-8 are written in the disjunctive and each provide

14

## II. Best Interests

Next, Mother challenges the trial court's conclusion that the adoption was in M.S.'s best interests. The primary concern in every adoption proceeding is the best interests of the child. *In re Adoption of M.L.*, 973 N.E.2d 1216, 1224 (Ind. Ct. App. 2012). Even if a court determines that a natural parent's consent is not required for an adoption, the court must still determine whether adoption is in the child's best interests. *See* I.C. § 31-19-11-1(a)(1).

The adoption statute does not provide guidance for which factors to consider when determining the best interests of a child in an adoption proceeding, but we have noted that there are strong similarities between the adoption statute and the termination of parental rights statute in this respect. *See In re Adoption of M.L.*, 973 N.E.2d 1216, 1224 (Ind. Ct. App. 2012) (holding that the adoption statutes and the termination statutes provide similar balances between parental rights and the best interests of the children; also holding that termination cases provide "useful guidance as to what makes a parent 'unfit'"). In termination cases, we have held that the trial court is required to look to the totality of the evidence to determine the best interests of a child. *In re I.A.*, 903 N.E.2d 146, 155 (Ind. Ct. App. 2009). Relevant factors include, among others, a parent's historical and current inability to provide a suitable environment for the child, *In re J.C.*, 994 N.E.2d at 290; the recommendations of the child's case worker or guardian ad litem;

---

independent grounds for dispensing with parental consent. *In re Adoption of K.S.*, 980 N.E.2d 385, 388 (Ind. Ct. App. 2012). As we have already found that Mother's consent was unnecessary as a result of her failure to support M.S., we need not address her second argument regarding her failure to communicate with M.S.

15

and the child's need for permanence and stability, *see A.J. v. Marion Cnty. Office of Family and Children*, 881 N.E.2d at 718.

When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion, and the trial court reached the opposite conclusion. *In re Adoption of M.L.*, 973 N.E.2d at 1222. As we stated above, we do not reweigh the evidence on appeal, but instead examine the evidence most favorable to the trial court's decision, together with reasonable inferences drawn therefrom. *Id.* Moreover, we generally give considerable deference to the trial court's decision in family law matters, as we recognize that the trial court is in the best position to judge the facts, determine witness credibility, get a feel for the family dynamics, and get a sense of the parents and their relationship with their children. *Id.*

Mother's primary arguments are that the adoption was not in M.S.'s best interests because: (1) Stepmother's petition to adopt M.S. was based on an unnecessary concern that she would lose custody of M.S. if something happened to Father; (2) the fact that M.S. is thriving in Stepmother's care does not justify terminating Mother's parental rights; and (3) a child's need for stability and permanence may not be the sole reason for terminating a parent-child relationship. With regard to the first argument, Mother does not clarify how Stepmother's motivations for filing the adoption petition relate to our consideration of M.S.'s best interests, and she has not cited any precedent stating that a petitioner must have a "necessary" concern for filing the petition. Accordingly, we find that Mother's argument is waived under Appellate Rule 46 for a failure to state a cogent argument, and we will not address her contentions.

With regard to Mother's second and third arguments, it might be true that neither of those factors alone could indicate that Stepmother's adoption would be in M.S.'s best interests. However, multiple additional factors support the trial court's judgment, and its decision did not rest solely on either the fact that M.S. has thrived in Stepmother's care or the fact that M.S. needs stability and permanence. Instead, the evidence demonstrates that, as we determined above, Mother failed to support M.S. for extended periods of time and also did not communicate with M.S. or make consistent attempts to reinstate her parenting time for several years. Mother also has a criminal history, a history of drug abuse, and a history of failing to follow court orders.

In contrast, Stepmother has a "really close" relationship with M.S., helps her with her homework, and attends M.S.'s activities, including a travel volleyball league and church. (App. 15). M.S. is thriving under Stepmother's care and is an honor roll student. Stepmother has never been convicted of a crime and has full-time employment. She also wants to adopt M.S. and cares for her deeply. M.S.'s guardian ad litem, Raatz, testified that M.S. looks to Stepmother to fulfill the maternal role in her life. According to Raatz, M.S. missed Mother but has settled into the home and feels loved. Finally, Raatz testified that the adoption is in M.S.'s best interests and will give her a sense of peace. As we note above, a guardian ad litem's recommendation is relevant to support a finding that adoption is in a child's best interest. *See A.J.*, 881 N.E.2d at 718.

In light of the above factors, we conclude that the trial court did not err in determining that adoption was in M.S.'s best interests. As we have also found that

Mother's consent was not required for the adoption, we likewise conclude that the trial court did not err in granting Stepmother's petition to adopt M.S.

Affirmed.

MATHIAS, J., and BRADFORD, J., concur.