# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 08 2017, 9:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Nancy A. McCaslin
Elkhart, Indiana

Heidi J. Cintron
Elkhart, Indiana

ATTORNEY FOR APPELLEES

Elizabeth A. Bellin
Elkhart, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In Re the Adoptions of
D.A.M.S. and N.D.S.,

N.S. and J.H.,

*Appellants-Respondents,*

v.

J.S. and L.S.,

*Appellees-Petitioners.*

November 8, 2017

Court of Appeals Case No.
20A04-1705-AD-1108

Appeal from the Elkhart Circuit
Court

The Honorable Michael A.
Christofeno, Judge

The Honorable Deborah A.
Domine, Magistrate

Trial Court Cause No.
20C01-1605-AD-40 & 20C01-1605-AD-41

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Respondents, N.S. (Father) and J.H. (Mother) (collectively, Parents), appeal the trial court's Order on Petitions for Adoption and Parental Consent, granting the adoption of their two minor children by Appellees-Petitioners, J.S. (Adoptive Father) and L.S. (Adoptive Mother) (collectively, Adoptive Parents).

We affirm.

# ISSUE

In separate briefs, Father raises two issues on appeal while Mother raises one issue. We find the following single issue to be dispositive: Whether the trial court erred in granting Adoptive Parents' petitions for adoption.

# FACTS AND PROCEDURAL HISTORY

In 2006, Parents met, and in 2007, they began cohabiting. They are the biological parents of N.D.S., born April 23, 2009; and D.S., born August 26, 2010 (collectively, Children). Mother has two additional children from prior relationships: A.S. and K.H., born in 1998 and 2000, respectively. Parents maintained an on-again/off-again relationship until 2016.

In April of 2011, an incident of domestic violence between Father, Mother, and a third party—during which a firearm was discharged—resulted in a criminal investigation. At the time, the four children were not present, but the police contacted the Elkhart County Office of Department of Child Services (DCS).

The children were removed from Parents' home and placed in the care of their maternal aunt and her husband—*i.e.*, Adoptive Parents. The children were subsequently adjudicated as Children in Need of Services (CHINS), and Parents were court ordered to comply with services as a condition of reunifying with the children. Over the next two years, Parents engaged in visitation with the four children and participated in some services as ordered. However, Father had several run-ins with law enforcement as a result of drugs, and there were ongoing concerns regarding his domestic abuse of Mother, which Parents never addressed through therapy. Instead, "[t]here was a lot of deception on those issues." (Tr. Vol. II, p. 245). Moreover, despite a no-contact order between Father and Mother, Mother allowed Father to be present during her time with the children, which resulted in the children's removal on two additional occasions when DCS had attempted trial home visits.

[6] After two years with no progress by Parents in remedying the conditions that resulted in the children's removal, DCS had to consider permanent options for the children's care. In lieu of having their parental rights terminated, Parents consented to a guardianship arrangement, whereby they could eventually petition to have the guardianships terminated and their custodial rights restored. Accordingly, on July 18, 2013, Adoptive Parents were granted

guardianship of A.S. and the Children.[1]  At that time, DCS closed the CHINS case and discontinued its involvement with the family.

[7]  Subsequent to the guardianship order, Father was in and out of incarceration: he was found in possession of marijuana, he violated probation with "dirty drop[s]," and he perpetrated domestic violence against Mother.  (Tr. Vol. II, p. 59).  Nevertheless, Parents' relationship persisted.  Mother maintained employment and stable housing, and Father also worked between his stints of incarceration; however, neither parent paid any support to Adoptive Parents for the Children's care during the guardianship.  Rather, despite the fact that the guardianship order granted Adoptive Parents the right to claim the Children as dependents for tax purposes, in 2013, 2014, and 2015, Father claimed both Children on his tax returns, and Mother did the same for A.S. and K.H.  On their tax returns, Parents declared that their respective dependents had lived in their home for the entirety of the years claimed.  Parents acknowledge that the last time they saw or spoke with the Children was July 18, 2013—the date that the guardianship was granted.  Thereafter, Father never made any effort to visit or otherwise contact the Children, whereas it is unclear to what extent Mother tried to maintain a relationship with the Children but was prevented from doing so by Adoptive Parents.  It is undisputed that neither Father nor Mother ever

---

[1]  Although K.H. lived with Adoptive Parents for a majority of the CHINS case, it was determined that it would be best for A.S. and K.H. to have separate placements due to their constant conflict.  Thus, K.H.'s paternal aunt became K.H.'s guardian for approximately a year and a half until K.H.'s biological father moved to terminate the guardianship and obtained custody.  Mother has regular contact with K.H.

petitioned the court for a parenting time order or for termination of the guardianship.

[8]     On May 31, 2016, Adoptive Parents filed petitions to adopt the Children, which they amended on October 21, 2016.[2] In their petitions, Adoptive Parents alleged that Parents' consent to the adoption was not required because Parents had not provided any support for the Children for more than one year and had not had any significant communication with the Children for more than one year. Adoptive Parents also argued that Parents' consent to the adoption was unnecessary because they are each "unfit to be a parent and it is in the [Children's] best interest for the court to dispense with [their] consent." (Appellant-Father's App. Vol. II, p. 128). Adoptive Parents contended that they satisfied the statutory criteria for adoption, including by being "fit and proper persons to care for, maintain, support, and educate" the Children. (Appellant-Father's App. Vol. II, p. 35).

[9]     On July 1, 2016, Mother filed notice of her intent to contest the adoption, and on July 12, 2016, Father did the same. On July 26, 2016, Adoptive Parents filed a home study conducted by Adoption Resource Services, Inc., which recommended that the adoption be finalized. On December 16, 2016, February

---

[2] On August 28, 2016, Adoptive Parents adopted A.S. with A.S.'s consent (as A.S. had reached the age of majority and parental consent was not required).

6, 2017, and April 10, 2017, the trial court conducted a hearing on Adoptive Parents' petitions.

[10] On April 17, 2017, the trial court issued its Order on Petitions for Adoption and Parental Consent. The trial court found that Parents failed to provide support for the Children throughout the guardianship, but because Parents "seemed legitimately confused over this issue[,]" the trial court declined to find that Parents had "knowingly" failed to do so. (Appellant-Father's App. Vol. II, p. 18). However, the trial court found that Parents had failed to communicate significantly with the Children for "half or more than half of the [C]hildren's lives" with "no excuse for that failing." (Appellant-Father's App. Vol. II, p. 21). The trial court also found that Parents are "unfit to parent their [C]hildren." (Appellant-Father's App. Vol. II, p. 24). Based on these findings, the trial court determined that parental consent for the adoption was not required, and the trial court further concluded that adoption would serve the Children's best interests. On April 28, 2017, the trial court issued a Decree of Adoption.

[11] Parents now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[12] When reviewing a trial court's ruling in an adoption case, "we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption." *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). In

fact, in matters of family law, the trial court is generally entitled to "considerable deference" owing to the recognition that the trial court "is in the best position to judge the facts, determine witness credibility, 'get a feel for the family dynamics,' and 'get a sense of the parents and their relationship with their children.'" *Id.* at 973 (quoting *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005)). Our court will not disturb the ruling of the trial court "unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." *Id.* Thus, we neither reweigh evidence nor assess the credibility of witnesses, and we consider the evidence most favorable to the trial court's decision. *Id.* Furthermore, the trial court's findings and judgment will only be set aside if they are clearly erroneous. *Id.* "A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment." *Id.* (quoting *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009)).

## II. *Consent*

[13] Parents challenge the trial court's judgment granting Adoptive Parents' petitions to adopt the Children in the absence of parental consent. Indiana Code section 31-19-9-1(a) provides, in relevant part, that "a petition to adopt a child who is less than eighteen (18) years of age may be granted only if written consent to adoption has been executed by . . . [t]he mother of a child born out of wedlock and the father of a child whose paternity has been established." Nevertheless, Indiana's adoption statute delineates certain exceptions where an

adoption may proceed without parental consent. Specifically, as relevant to the case at hand, consent is not required by:

> * * * *
> (2) A parent of a child in the custody of another person if for a period of at least one (1) year, the parent:
>     (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
>     (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.
> * * * *
> (11) A parent if:
>     (A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and
>     (B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

Ind. Code § 31-19-9-8(a). "The provisions of this section are disjunctive, and any one provides independent grounds for dispensing with parental consent." *In re Adoption of S.W.*, 979 N.E.2d 633, 640 (Ind. Ct. App. 2012).

[14] Adoptive Parents had the burden of establishing by clear and convincing evidence that Parents' consent was not required. *Id.*[3] In their petition for adoption, Adoptive Parents alleged that consent was not required based on all of the aforementioned statutory bases. The trial court determined that it could not dispense with parental consent based on a failure to provide for the care and

---

[3] Father contends that Adoptive Parents had to prove that consent was not required "by clear and indubitable evidence"; however, this standard has long been abrogated. (Appellant-Father's Br. p. 20); *see In re Adoption of S.W.*, 979 N.E.2d at 640.

support of the Children because Parents had not *knowingly* failed to provide such. Nonetheless, the trial court found that consent was not required because Adoptive Parents had sufficiently proven that Parents had, without justifiable cause, failed to communicate with the Children for at least one year; that Parents are unfit to parent the Children; and adoption is in the Children's best interests.

[15] Parents concede that they did not have significant communication with the Children for at least one year, but they now claim that this failure was justified because Adoptive Parents thwarted their attempts to maintain a relationship with the Children. Although the burden of proof in an adoption proceeding rests with the prospective adoptive parents, Indiana Code section 31-19-9-8(a)(2)(A) clearly establishes that the non-custodial parent is responsible for maintaining a relationship with his or her child in order to exercise the right to consent to an adoption. Indeed, the purpose of this statutory provision "is to foster and maintain communication between non-custodial parents and their children, not to provide a means for parents to maintain just enough contact to thwart potential adoptive parents' efforts to provide a settled environment to the child." *In re Adoption of S.W.*, 979 N.E.2d at 640 (internal quotation marks omitted). Efforts of the prospective adoptive parent "to hamper or thwart communication between a [non-custodial] parent and child are relevant in determining the ability to communicate" and should be weighed in the non-custodial parent's favor. *E.W. v. J.W.*, 20 N.E.3d 889, 896-97 (Ind. Ct. App. 2014), *trans. denied*.

[16]    According to Mother, Adoptive Parents "cut off communications" after the guardianship was established. (Appellant-Mother's Br. p. 19). Prior to the guardianship, Mother insisted that she had engaged in regular visits with the Children and had provided the Children with gifts and taken them on outings, but her post-guardianship requests to see the Children or deliver gifts were ignored. Mother also contended that she persistently asked her mother (who is also the mother of Adoptive Mother), to request visits with Adoptive Mother on Mother's behalf. Mother claimed that she attempted to contact Adoptive Mother, in one way or another, "[a]t least" once a month between 2013 and 2015 and did not cease communicating until Adoptive Parents filed their petitions for adoption. (Tr. Vol. II, p. 172). Mother also now relies on the fact that she maintained a relationship with K.H. throughout K.H.'s guardianship and subsequent placement in her biological father's custody as evidence of the fact that Mother would have made the same efforts to maintain communication with the Children.

[17]    As to Father, the record is clear that he never made any effort to communicate with or visit the Children during the guardianship because he "don't got [sic] their phone number. And I don't got [sic] their address. And I'm not friend [sic] with them on Facebook." (Tr. Vol. II, p. 73). In fact, it was not until just prior to the hearing on Adoptive Parents' adoption petitions that Father sent a letter to inquire about the Children, but "conduct *after* the petition to adopt was filed is wholly irrelevant to the determination of whether the parent failed to significantly communicate with the child for any one year period." *In re*

*Adoption of S.W.*, 979 N.E.2d at 640 n.3 (internal quotation marks omitted). Yet, on appeal, he argues that "he was justified in the lack of significant communication because [Adoptive Parents] had made communication difficult, if not impossible for [Father]." (Appellant-Father's Br. p. 24). Father complains that, unlike during DCS's involvement in the CHINS case, visitation during the guardianship was not facilitated. Father also testified that, at the time the guardianship was established, Adoptive Parents had informed him "he would not see the [C]hildren again." (Appellant-Father's Br. p. 25).

During the hearing, Adoptive Parents conversely testified that they never prevented Parents from sending or dropping off gifts for the Children, but they never sent anything—*i.e.*, gifts, birthday or Christmas cards, letters, clothing, etc. Adoptive Parents denied that they cut off Mother's communication, and Adoptive Parents could not recall Mother or Father ever requesting to see the Children after the guardianship was established. Adoptive Parents also conceded that they had significant safety concerns about Father and would not have granted an unsupervised visitation request for Mother in light of the fact that Father would also have been present. Adoptive Parents indicated that they wanted Parents to establish stability before having access to the Children.

The trial court "considered the conflicting testimony of family members over whether or not contact between [Father] and [Mother] and their [C]hildren was blocked by [Adoptive Parents], or whether [Mother] and [Father] simply did not call." (Appellant-Father's App. Vol. II, p. 20). Rather than making a credibility determination, the trial court concluded

that it does not matter which of the family members is telling the truth. And it does not matter if [Father] did or did not have [Adoptive Parents'] phone number. It does not matter because even if [Father's] lack of communication could be excused by his not having [Adoptive Parents'] phone number, and even if [Adoptive Parents] thwarted [Mother's] attempts to communicate with her [C]hildren, both [P]arents could have sought visitation through a court under the [g]uardianship case that placed the [C]hildren in [Adoptive Parents'] home. Both [P]arents testified that they did not even attempt to petition a court for visitation. Both testified that they never attempted to have the [g]uardianship terminated. Therefore, the [c]ourt finds that [Father] and [Mother] have failed to communicate significantly with [the Children] for three and a half years, which is half or more than half of the [C]hildren's lives. They have no excuse for that failing.

(Appellant-Father's App. Vol. II, pp. 20-21). We agree with the trial court.

[20] Our supreme court has held that in instances of an apparent inability to communicate with a child, the non-custodial parent has a duty "to investigate reasonable means of doing so." *In re Adoption of O.R.*, 16 N.E.3d at 974. The conduct of the prospective parents in thwarting communication is relevant, but it is not dispositive; the onus is on the non-custodial parent to attempt significant communication. Here, Parents have pled ignorance as to their ability to petition the court for recourse against Adoptive Parents' purported thwarting activities, but we are unpersuaded by such a claim. *See id.* (noting that the non-custodial father could have initiated contact with petitioners' counsel or the court to obtain communication with his child and finding no merit in the father's claimed unfamiliarity with the court system in light of his

criminal history). Parents were clearly aware that they maintained certain parental rights because they consented to a guardianship in lieu of having those rights terminated. Parents were further aware of their ability to ask the court that the guardianship be terminated in light of their testimony that K.H.'s biological father had successfully terminated her guardianship and obtained custody. With handwritten letters and even in the absence of legal representation, Parents successfully notified the court that they wished to contest Adoptive Parents' adoption petitions, which only serves to dilute their claim that they did not know they could seek court intervention. It was the Parents' duty to investigate the available channels for communication, but the record is clear that they expended minimal effort in the fight for their Children and did not avail themselves of the available means. Therefore, the trial court properly concluded that Parents failed, without justifiable cause, to significantly communicate with the Children for at least one year such that their consent to the adoption was not required.[4]

### III. *Best Interests & Suitability of Adoptive Parents*

[21] Even where consent is not required, the trial court may only grant a petition for adoption if the adoption is in the best interest of the child and if the prospective

---

[4] Because we find that Parents' consent was not required based on their failure to communicate, we need not address either Parents' claim that the trial court erroneously found that they were unfit or Adoptive Parents' claim that the trial court erroneously found that Parents had not knowingly failed to provide support. Furthermore, we note that Father has claimed that the trial court abused its discretion by admitting evidence of his criminal history that was irrelevant as to his fitness as a parent. As we have determined that Father's consent was not required based on his failure to communicate, we need not address his claim.

adoptive parents "are of sufficient ability to rear the child and furnish suitable support and education," among other factors. I.C. § 31-19-11-1(a)(1)-(2). "The primary concern in every adoption proceeding is the best interests of the child." *In re Adoption of M.S.*, 10 N.E.3d 1272, 1281 (Ind. Ct. App. 2014). Although the "adoption statute does not provide guidance for which factors to consider when determining the best interests of a child in an adoption proceeding," our courts "have noted that there are strong similarities between the adoption statute and the termination of parental rights statute in this respect." *Id.* Thus, the trial court must consider "the totality of the evidence to determine the best interests of a child." *Id.* "Relevant factors include, among others, a parent's historical and current inability to provide a suitable environment for the child; the recommendations of the child's case worker or guardian ad litem; and the child's need for permanence and stability." *Id.* at 1281-82 (internal citations omitted).

[22] Mother contends that the Children's best interests require reversal of the adoption because she "has a clean home and a stable job and can care for all of her children." (Appellant-Mother's Br. p. 24). She also argues that this "adoption not only severs the parent child relationship between [her] and [the Children], but it also severs the sibling group" as K.H. is in the custody of her biological father. (Appellant-Mother's Br. p. 23). She posits that it is in the Children's best interest "to have a relationship and bond with their entire family unit." (Appellant-Mother's Br. p. 24). Similarly, Father asserts that the adoption should be reversed for the Children's best interests because he "had

supported himself earlier and the record does not show he would be unable to do so when he was no longer incarcerated." (Appellant-Father's Br. p. 29). Furthermore, Father "was taking courses to make him a better person after incarceration." (Appellant-Father's Br. p. 30).

[23] In finding that adoption would serve the Children's best interests, the trial court relied, in part, on the opinions of both the DCS caseworker who handled the family's CHINS case and the Children's former court-appointed special advocate (CASA). The DCS caseworker testified at the adoption hearing that Parents never addressed the domestic violence issues that resulted in the Children's initial removal, and, instead, Parents were deceptive and continued to maintain an unstable relationship. The DCS caseworker claimed that she refused to meet with Father alone because of his hostility. The DCS caseworker also remarked on instances of Father's inappropriate parenting style—such as his references to N.D.S. as "Little Sexy" and D.S. as "Little N*****." (Tr. Vol. II, p. 243). The CASA testified at the adoption hearing regarding her disagreement with returning the Children to Parents' care based on their lack of progress. Although she did not "observe the kind of—of easy nurturing and interaction that goes on, usually[,] between parents and children" in the Children's interactions with Mother, the CASA stated that, with Adoptive Parents, "there's always patience, there's conversation, there is gentle discipline when it's necessary, encouragement, umm, just conversation and nurturing." (Tr. Vol. III, p. 37).

[24]     In addition, the trial court cited the opinion of the social worker who completed the adoption home study. The social worker recommended the adoption would be in the Children's best interests as Adoptive Parents "are good, ethical, nurturing parents." (Tr. Vol. II, p. 201). References for Adoptive Parents provided "glowing accounts of how well the [C]hildren were doing and how . . . happy and content and well-adjusted they were." (Tr. Vol. II, p. 200). A.S. also testified during the adoption hearing and opined that the Children would not be safe if they were returned to Parents' care.

[25]     Our review of the record establishes that the Children have continuously been in Adoptive Parents' care since April of 2011, except for two brief trial home visits. At the time of their removal, N.D.S. was almost two years old, and D.S. was approximately eight months. Thus, the Children have spent most of their lives in the care of Adoptive Parents because of Parents' refusal to put the Children's needs ahead of their own. For nearly two years during the CHINS proceedings, Parents failed to address the issues necessary for reunification, and during the three years between the establishment of the guardianship and the filing of adoption petitions, Parents made no effort to safeguard their parental rights, and they offered no support for the Children. Meanwhile, during that entire time, Adoptive Parents provided for the financial, emotional, and physical needs of the Children. Thus, the trial court's determination regarding the Children's best interests is clearly supported by the evidence.

[26]     Parents also challenge Adoptive Parents' ability to rear the Children. Parents both cite Adoptive Mother's chronic pancreatitis as an impairment to her ability

to care for the Children and claim that it is contrary to the Children's best interests. At the hearing, Adoptive Mother testified that she has been battling chronic pancreatitis for more than fifteen years. During that time, she has been on various pain medications, including morphine, a fentanyl patch, and other narcotics. She administers her medicine through a feeding tube as she needs it, and "[s]ometimes, [she] get[s] a little sleepy." (Tr. Vol. IV, p. 102). She regularly sees her doctors and has had several operations and procedures over the years; her need for pain medication varies day by day. Adoptive Mother admitted that in April of 2016, her feeding tube had fallen out, which caused her to become dehydrated and experience low levels of potassium. As a result, while driving to go have her tube changed, she blacked out and was involved in a minor car accident. The Children were not in the car at the time of the accident.

[27] The trial court took the evidence concerning Adoptive Mother's illness into account but determined that "those concerns [do not] negate the best interest finding otherwise supported by the evidence." (Appellant-Father's App. Vol. II, p. 26). The trial court noted that Adoptive Mother

> explained that her chronic disease impacts how her body processes food and the car accident was the result of low potassium levels. She testified that she believes that her disease is under control and she testified that she has a lot of family support when needed by her medical condition. And even while struggling with a serious illness, she described that she has been able to provide for the needs of [the Children]. There is no evidence to the contrary.

(Appellant-Father's App. Vol. II, p. 26). The evidence clearly establishes that Adoptive Mother has managed this medical condition for more than fifteen years, during which time she raised two biological children and has provided safe and consistent care for the Children at issue. The social worker who conducted the case study reviewed Mother's medical history and did not find that the condition should hinder the adoption. Adoptive Parents share in the responsibilities of raising children and have demonstrated their ability to rear the Children notwithstanding Adoptive Mother's medical condition. We decline Parents' obvious request to reweigh the evidence already considered by the trial court.

## CONCLUSION

[28] Based on the foregoing, we conclude that the trial court did not err in granting Adoptive Parents' adoption petitions because they established by clear and convincing evidence that Parents' consent to the adoption was not required and because adoption is in the Children's best interests.

[29] Affirmed.

[30] Robb, J. and Pyle, J. concur