

FILED

Nov 17 2023, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Denise F. Hayden
Lacy Law Office, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Adoption of P.J.W. | November 17, 2023 |
| James D. DeClerck and Marilyn J. DeClerck, | Court of Appeals Case No. 23A-AD-1254 |
| *Appellants-Petitioners,* | Appeal from the Montgomery Superior Court |
| v. | The Honorable Daniel G. Petrie, Judge |
| Ronald J. Walters, | Trial Court Cause No. 54D02-2204-AD-8 |
| *Appellee-Respondent.* | |

**Opinion by Judge Mathias**
Judge Riley concurs.
Judge Crone dissents with a separate opinion.

**Mathias, Judge.**

[1] James D. DeClerck ("Grandfather") and Marilyn J. DeClerck ("Grandmother") (collectively, "Grandparents") appeal the Montgomery Superior Court's denial of their petition to adopt P.J.W. ("Child"). Grandparents present a single issue for our review, namely, whether the trial court abused its discretion when it found that adoption is not in Child's best interests.

[2] We affirm.

## Facts and Procedural History

[3] Grandparents are the maternal great-grandparents of Child, born September 14, 2016. Child's father is Ronald Walters ("Father"), and Child's mother is deceased. Child lived with Grandparents part-time until 2019, when he went to live with them fulltime in Illinois. Grandparents established their permanent guardianship over Child, without objection from Father, in September 2020.

[4] Father has an extensive criminal history dating back to 2003, including felony convictions for strangulation[1] in 2019 and possession of methamphetamine in 2021, and he has been incarcerated for much of Child's life. In April 2022, Grandparents filed a petition to adopt Child. Father timely filed an objection and motion to contest the adoption.

---

[1] Father strangled his own mother, who survived the attack.

In February 2023, the trial court held a hearing to determine whether Father's consent to the adoption was required. Father testified that he was participating in drug court, which included individual therapy and weekly drug screens. He testified that he was maintaining his sobriety and had stable employment. Father also testified that he had sent letters to Child, and he had messaged Grandmother over Facebook asking to see Child. Grandparents had never responded to any of Father's attempts to communicate with or to see Child. At the conclusion of that hearing, the trial court concluded that Father's consent to the adoption was not necessary. The court found in relevant part that Father had not provided financial support to Child when he was able to do so. The trial court did *not* find that Father was unfit to parent Child.

During the final adoption hearing in April, Grandparents testified that they have raised Child since 2019 and have provided significant and consistent care for Child since his birth. On the date of the final hearing, Grandfather was seventy-one and Grandmother was seventy-four years old. They admitted that they had received communications from Father over the years but did not pass along those communications to Child. Grandparents have, however, kept letters from Father in a box to show to Child when he is older. Father testified that he had stable employment and a home, he had close ties to his community, and he wanted to be a father to Child.

The trial court found and concluded in relevant part as follows:

> 8. At the time [Child] reaches 18 years of age, [Grandparents] will be 82 and 86 years of age, respectively.

* * *

10. . . . [Grandparents] remain guardians of the Child at this time.

11. Since January 2019, the Child has resided almost exclusively with [Grandparents].

12. Father has an extensive criminal history, including a new criminal charge for driving while suspended which was filed during the pendency of this action.

13. Father has made significant progress towards rehabilitation through his participation in the Montgomery County Drug Court ("Drug Court"). Father has progressed to the third phase of Drug Court, and he anticipates graduating this year. Since placement on Drug Court, Father has participated in or completed the following: (i) individual therapy; (ii) self-help meetings; (iii) individual outpatient therapy; (iv) drug screens; and (v) other services provided by or recommended by probation.

14. Father has been sober since at least his placement in Drug Court on or about May 13, 2021, and he has not committed a new criminal offense since that date.

15. Father is gainfully employed at this time, as he holds a part-time position and owns and operates a local business. He has had the ability, at times, to provide some type of support for the Child.

16. Father has made inconsistent attempts to communicate with the Child since the appointment of the Child's guardians. Father did, however, testify that he has made attempts to initiate contact at least every six (6) months with the Child since January 2019. At times, Father had repeated, consistent contact with the Child, often while in custody. Visitation he had while in custody was

provided through Mother, prior to her passing, and occasionally the Child's maternal grandmother.

17. While in custody, Father often sent letters and pictures to the Child. He would send said correspondence to [Grandparents'] address, but he never received a response or any type of verification that his correspondence had been received. Father also sent correspondence to the Child's maternal grandmother for delivery to the Child.

18. On July 11, 2021, Father sent a lengthy message to [Grandmother] over Facebook, requesting, in part, to have contact with his Child. [Grandmother] testified that she received said message; she did not reply to Father, but rather blocked his account so that he could no longer attempt to initiate contact over Facebook.

19. [Grandparents] testified that they have received a number of letters and pictures from Father for the Child. They further testified that no such correspondence has been provided to the Child and that they have at no point responded to Father to confirm their receipt of the same.

* * *

22. Father did not and does not feel welcome at the home of [Grandparents]. [Grandparents] testified that Father has not been to their home since 2018; they further testified that Father has not been invited to the home since 2018. While [Grandparents] testified that Father had the ability to see the Child if he wanted, their actions do not align with said statement. Furthermore, Father is not permitted to travel out-of-state due to his placement on probation.

23. [Grandparents] have made no effort to arrange or allow contact between Father and the Child. Indeed, [Grandparents]

appear to have actively worked to prevent Father from having contact with the Child.

* * *

26. [Grandparents] testified that the Child still remembers Father. The Court finds said testimony credible, and that a bond remains between Father and the Child.

27. The Father, through testimony, clearly desires to act as the child's father.

CONCLUSIONS OF LAW

1. In Indiana, broad discretion is allowed to the trial court in determining what is in the "best interests of a child."

2. The Court's position is that it is inherently in a child's best interest to be raised by a biological parent.

3. The protection of rights of natural parents is carried to a further degree in adoption proceedings than in custody cases. . . .

4. The Court in determining how to balance all relevant factors, sees two issues as the primary drivers in its decision-making:

> a. First, that the Father has made significant steps in the past several years through his participation in the Montgomery County Drug Court and his involvement in the community to show a reformation from prior criminal activities.

> b. Second, that [Grandparents], while healthy and active currently, are asking to be the parent of this child well into their 80's. While this may be possible, the Court does not see this as an ideal situation.

CONCLUSION

Based on the foregoing, this Court FINDS that [Grandparents] have not met their burden of proof herein and that the adoption of [Child] by [Grandparents] IS NOT in the child's best interest. The Petition for Adoption is hereby DENIED.

Appellants' App. Vol. 2, pp. 8-11. This appeal ensued.

## Discussion and Decision

Grandparents appeal the trial court's denial of their petition to adopt Child. Our standard of review is well settled:

> In family law matters, we generally give considerable deference to the trial court's decision because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, "get a feel for the family dynamics," and "get a sense of the parents and their relationship with their children." *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005). Accordingly, when reviewing an adoption case, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption. [*N.R. v. K.G. and C.G.*], [(]*In re Adoption of O.R.*[)], 16 N.E.3d 965, 972-73 (Ind. 2014).
>
> *J.W. v. D.F. (In re E.B.F.)*, 93 N.E.3d 759, 762 (Ind. 2018). We will not disturb the trial court's decision in an adoption proceeding unless the evidence at trial leads to but one conclusion and the trial court reached the opposite conclusion. *R.K.H. v. Morgan Cty. Ofc. of Fam. and Children (In re Adoption of M.W.)*, 845 N.E.2d 229, 238 (Ind. Ct. App. 2006), *trans. denied*. We will neither reweigh the evidence nor assess the credibility of

witnesses, and we will examine only the evidence most favorable to the trial court's decision. *Id.*

*C.G. v. O.M. (In re E.M.M.)*, 164 N.E.3d 779, 781-82 (Ind. Ct. App. 2021), *trans. denied*.

[9] "Even if a court determines that a natural parent's consent is not required for an adoption, the court must still determine whether adoption is in the child's best interests." *In re Adoption of O.R.*, 16 N.E.3d at 974 (quoting *C.L.S. v. A.L.S (In re Adoption of M.S.)*, 10 N.E.3d 1272, 1281 (Ind. Ct. App. 2014)). Indiana Code section 31-19-11-1(a)(1) provides that a court cannot grant an adoption petition unless it is in the child's best interests. To put it succinctly, "[t]he primary concern in every adoption proceeding is the best interests of the child." *In re Adoption of M.S.*, 10 N.E.3d at 1281.

[10] Father did not file an appellee's brief, and, in such a case, we "need not develop an argument for [Father] but instead will reverse the trial court's judgment if [Appellants'] brief presents a case of prima facie error." *In re Adoption of E.B.*, 163 N.E.3d 931, 935 (Ind. Ct. App. 2021) (citation and quotation marks omitted). Prima facie error means "at first sight, on first appearance, or on the face of it." *Jenkins v. Jenkins*, 17 N.E.3d 350, 352 (Ind. Ct. App. 2014). "Still, we are obligated to correctly apply the law to the facts in the record to determine whether reversal is required." *Id.*

[11] Grandparents contend that the trial court abused its discretion when it found that adoption is not in Child's best interests based on their advanced ages and

Father's purported rehabilitation. They emphasize the evidence regarding their stable lives and years of caring for Child as his guardians, and they contrast that evidence with Father's history as a violent criminal. But Grandparents' argument is nothing more than a request that we reweigh the evidence, which we cannot do on appeal.

[12] As the dissent's separate opinion makes clear, this is an extremely close case. We cannot ignore Father's extensive criminal history and ongoing battle with substance abuse. But Father testified to his continuing sobriety, stable employment, and involvement in his community. Father testified further regarding his desire to share with Child their Mexican heritage. The trial court clearly found Father's testimony compelling and opted not to terminate Father's parental rights. We simply cannot reassess Father's credibility on appeal. As our Supreme Court has emphasized,

> [a] parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). And as we have acknowledged on more than one occasion "the parent-child relationship is 'one of the most valued relationships in our culture.'" *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010) (quoting *Neal v. DeKalb Cnty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)); *see also Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).

*In re Adoption of O.R.*, 16 N.E.3d at 972. The trial court here concluded that Father deserved more time to nurture a parental relationship with Child, and we cannot agree with the dissent that that conclusion is clearly erroneous.

[13] We are also mindful of the language of Article 1, Section 18 of Indiana's Constitution, which counsels that our penal code is "founded on the principles of reformation, and not of vindictive justice." However, the principles of reformation are not an exact science. Confirmation of reformation is an ongoing process. The best examples of this confirmation process are Indiana's drug and veterans' courts and the reporting hearings they hold. In a close case like this where the safety of a child may be at risk, those types of reporting hearings may not be out of place. Here, the trial court judge was clearly convinced that Father appears to have changed his life for the better. And we must be guided by the broad discretion of trial court judges in family relations cases.

[14] Importantly, the Grandparents' guardianship remains in full force and effect. We may not have made the same decision as the trial court, but that is not our standard of review.

[15] For all these reasons, we cannot say that the trial court abused its broad discretion when it found that adoption is not in Child's best interests and denied Grandparents' adoption petition.

[16] Affirmed.

Riley, J., concurs.
Crone, J., dissents with a separate opinion.

**Crone, Judge, dissenting**.

I agree with the majority's general presumption of correctness afforded to trial court decisions in family law matters. Additionally, I agree that the lower prima facie standard applies here because Father did not file an appellee's brief. I point out that we "owe no deference" to a trial court's legal conclusions. *In re Adoption of A.M.*, 930 N.E.2d 613, 616 (Ind. Ct. App. 2010).

I cannot agree with the trial court's legal conclusion 2 that "it is *inherently* in a child's best interest to be raised by a biological parent." Appellants' App. Vol. 2 at 10 (emphasis added). That does not constitute a proper legal conclusion. If it were so, the mere existence of a biological parent would preclude adoption in every instance. It is true that we "must strictly construe the [adoption] statute in favor of the rights of biological parents." *In re B.W.*, 908 N.E.2d 586, 592 (Ind. 2009). However, that does not mean that it is always in a child's best interests to be raised by a biological parent. Further, we have often stated our unwillingness to place a child "on a shelf" indefinitely in hopes that a biological parent can finally transform into a capable, appropriate caregiver. *See Matter of Campbell*, 534 N.E.2d 273, 275 (Ind. Ct. App. 1989). Again, the paramount consideration must be the best interests of the child.

Here, the testimony reveals that during the first two years of Child's life, Appellants took care of him for "two weeks, three weeks out of every month." Tr. Vol. 2 at 7. Thereafter, Appellants took two-year-old Child into their home to live full time, and in 2019 they filed an emergency petition for guardianship

because both parents were facing criminal charges and incarcerated. Appellants' App. Vol. 2 at 17-18. The Appellants became permanent guardians without objection from either parent, and then Mother died. Indisputably, Appellants have raised Child, now seven years old, for the vast majority of his existence. Yet, within purported legal conclusion 4, the trial court's stated "primary drivers in its decision-making" are Father's "reformation from prior criminal activities" and the advanced ages of Appellants. *Id*. at 11. I view the former as speculative at best and the latter as another example of the trial court's inappropriate bias with no basis in precedent or statute.

[20] Father has a lengthy, varied, and serious criminal history that includes the following convictions: 2003 burglary, theft, and escape, 2006 DWI and possession of paraphernalia, 2012 battery, trespassing, and criminal mischief, 2014 intimidation, 2015 criminal mischief, 2019 battery, strangulation, theft, and invasion of privacy, plus possession of methamphetamine. Of his four felonies, one includes strangling his own mother so severely that she lost control of her bodily functions. At the adoption hearing, Father claimed that he has made positive strides since his most recent felony conviction for methamphetamine possession. Such self-serving testimony was belied by the in-court revelation that he had committed a new criminal offense between the consent hearing and the best interests hearing. Father attempted to downplay it as "[j]ust a driving while suspended" charge. Tr. Vol. 2 at 109. Such disregard for the law does not demonstrate reformation from his long, violent history. Father also admitted that he has four other children but sees only two of them.

While Father has sent some correspondence to Child,[2] he has not financially supported Child.

[21]     As for Appellants, they have been married for forty-plus years. For thirty years, they have lived in the same three-bedroom house with a one-acre yard and a playhouse out back. Appellants each had careers, now have retirement accounts and social security, and currently work part time for the public school district attended by Child. Mr. DeClerck is a school bus driver, and Child gets to ride with him on the morning and afternoon routes. Mrs. DeClerck works part time as a bus monitor. Both Mr. and Mrs. DeClerck are in good health. *Id*. at 75, 76. Appellants don't just feed, clothe, and house Child. Their activities include walking three miles per day, playing soccer and basketball with Child, going to the park with Child, and even roller skating with him. They take him for regular checkups at his pediatrician and dentist. They arrange play dates with other children, facilitate visits with relatives, and let him try karate, tumbling, tee ball, and swimming. They spend much of each summer at a campground where Child has numerous friends. Child, who has his own bedroom at their house, is well known and comfortable in his community. Regarding his relationship with Child, Mr. DeClerck testified:

> We do everything together. If I go to go outside, he goes outside.
> If I work on the cars, he wants to help me work on the cars. If
> I'm doing something around the house, he wants to help me do

---

[2] Contrary to Finding 19, the testimony indicated that Appellants have read such letters to Child and placed them in a file so they are available to Child in the future. Tr. Vol. 2 at 22.

something around the house. If I go somewhere, he wants to go with. I mean, he's basically my shadow.

*Id.* at 85. Similarly, Child helps Mrs. DeClerck with chores inside and outside the house, and they play and cook together. The family has a dog that Child refers to as "his dog." *Id.* at 90. Child is polite, considerate, has no problems at school, requires no counseling, and is a "joy to be around." *Id.* at 96.

[22] Today, on average, people live longer, healthier, more productive lives than just a few generations ago. And, we trust people in their seventh and eighth decade with extraordinarily difficult responsibilities, including running our country. To cavalierly dismiss, simply because they will be in their eighties when Child becomes an adult, two "healthy and active," fully committed relatives as adoptive parents when they are essentially the only parents that Child has known strikes me as being the opposite of the best interests of Child. *See* Appellants' App. Vol. 2 at 11 (legal conclusion 4). If at some point our legislature sees fit to set a maximum age for adoptive parents, then I will reconsider. Until then, I cannot concur with utilizing clear age bias to justify denying Child the stability, financial support, and love of the DeClercks, particularly given Father's history.

[23] Concluding that Appellants have met their burden of rebutting the presumption that the trial court's decision is correct, I would reverse with instructions to grant the petition for adoption.