FILED

May 25 2018, 11:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Karen Celestino-Horseman
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Alan D. Wilson
Kokomo, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

In Re: The Matter of the
Adoption of:

E.M.L., (Minor)

S.L.,

*Appellant-Petitioner,*

v.

K.G.,

*Appellee-Respondent.*

May 25, 2018

Court of Appeals Case No.
29A05-1710-AD-2250

Appeal from the Hamilton
Superior Court

The Honorable Steven R. Nation,
Judge
The Honorable William P.
Greenaway, Magistrate

Trial Court Cause No.
29D01-1608-AD-997

**Barnes, Judge.**

## Case Summary

[1]    S.L. ("Father") appeals the granting of the adoption petition filed by K.G.

("Stepfather") for Father's biological child, E.M.L. ("Child").  We reverse.

## Issue

Father essentially raises two issues. We need only address the dispositive issue of whether the trial court properly concluded that Father's consent to Child's adoption by Stepfather was unnecessary.

## Facts

Child was born in 2009 to T.G. ("Mother"). Father, Mother, and Child lived together for about a year before Mother and Child moved out. Father established paternity in December 2011 and was ordered to pay child support. Mother and Father were granted joint physical and legal custody of Child. From the time of Child's birth, he spent approximately every other weekend with his paternal grandparents in Brown County. Father often visited with Child when he was at the grandparents' house. Mother and Stepfather married in 2012.

Between December 2011 and December 2012, Father paid about $620 of the $3,380 he would have owed in child support. There is scant evidence in the record as to Father's employment situation during that time frame; evidently, Father was employed as a machinist when his child support obligation was calculated but lost that job sometime thereafter, according to Mother.

In March 2012, Father was arrested for dealing in methamphetamine. On July 1, 2013, Mother filed a motion to modify custody. On October 9, 2013, the trial court granted Mother sole legal and primary physical custody of Child. This order contained no requirement that Child's visitation with Father be

supervised or otherwise placed any limitations on his visitation or contact with Child.

[6] Father was convicted of dealing in methamphetamine in March 2013 and was incarcerated through July 2014. Father sought and was granted a complete abatement of his child support obligation to $0 while he was incarcerated.[1] Father frequently telephoned and spoke with Child when Child was visiting Father's parents.

[7] After being released from incarceration, Father resumed frequent visitation with Child through Child's weekend visits with Father's parents. However, on June 9, 2015, Father filed a pro se "request" regarding parenting time and custody, alleging that Mother improperly refused to allow Child to continue visiting Father in Father's own home and refused to allow Father any unsupervised visitation with Child. App. Vol. II p. 113. A hearing on the matter originally was scheduled for August 6, 2015, but was continued to November, and then December, and finally to February 10, 2016.

[8] Before a hearing was held, Father was arrested in November 2015 on a domestic battery charge for slapping a girlfriend in front of two children. He remained in jail until he pled guilty in February 2016, at which time he was

---

[1] The State, in a Title IV-D action, had first sought a total abatement of Father's support obligation while he was incarcerated. This request was dismissed when Father failed to appear telephonically at a hearing while incarcerated. Father subsequently filed his own motion seeking a child support abatement, which was granted.

released on probation. He moved in with his parents thereafter. Meanwhile, Father's June 2015 petition regarding parenting time was dismissed after he failed to appear at the February 2016 hearing on the matter, apparently held while he was still incarcerated. However, the trial court ordered an abatement of Father's support obligation while he was incarcerated.

[9] Mother and paternal grandmother ("Grandmother") frequently communicated by text message regarding Child and Father, Child's visitation with paternal grandparents, and Child's sports activities in Noblesville that Mother invited paternal grandparents but not Father to attend.[2] After Mother learned of Father's domestic violence arrest in November 2015, she texted Grandmother, "I don't trust [Father's] judgement [sic] with his girlfriends that he affiliates himself with, which is why I never thought it was a good idea for [Child] to be around [Father] and his girlfriend." Ex. 8, p. 42.[3] On November 27, 2015, Mother texted Grandmother,

> I wanted to let you know that [Child] knows that [Father] is in jail. Unfortunately with what I've learned about [Father's] behavior in the last year, that until [Father] and I talk to each other and get things resolved in court, that it's in [Child's] best interest for [Father] to not talk with [Child] over the phone. I know this is tough for you, but I'm trusting you to be sure that

---

[2] Mother does not dispute the accuracy or veracity of these text messages as introduced into evidence. Also, Father never had a cell phone with which he could have texted Mother.

[3] The page numbers with respect to the exhibits refers to the page of the entire exhibit volume, not the individual exhibit.

there's no communication going on between [Child] and [Father].

*Id.* at 44. Grandmother responded to this text,

I will respect your wishes, but I don't know what you mean about his behavior in the last year? The issues he had was between him and that girl. Nothing to do with [Child] at all. He has not been on any drugs and was doing good, until the incidents with her. I think it would hurt [Child] more by not being able to talk to his Dad. . . . Please answer the phone when [Father] triesto call you . . . .

*Id.*

[10] On November 29, 2015, Grandmother texted Mother,

I told [Child] last night when [Father] called, that he couldn't talk to him, he buried his head in the couch with tears and asked why? I broke down and let him talk to him for a minute. I know I told you I wouldn't but he broke my heart when I seen him. I am sorry. I told [Child] when he asked why, he would need to talk to you. Please don't be to [sic] upset with me. . . .

*Id.* at 45. Mother responded, "I'm not upset with you, I'm just really disappointed with [Father]." *Id.*

[11] On Christmas Day 2015, Grandmother texted Mother, "[Paternal grandfather] will be picking up [Child] today. Can you please find it in your heart to let [Child] talk to his Daddy?" *Id.* at 48. Mother responded,

[Child] can not [sic] talk to [Father]. I'm raising [Child] to be responsible for his own actions and respectful of women and

[Father] is supposed to be a positive role model with this for [Child] and doesn't demonstrate that for him, therefore [Father] doesn't need to be talking with [Child] until [Father] gets the help that he needs. We know that this is not a one time incident and that this has been a reoccurring pattern for a while with [Father].

*Id.*

[12] On Child's birthday, January 17, 2016, Grandmother texted Mother asking if Father could call and wish Child a happy birthday. Mother responded that he could do so. Grandmother then texted, "I just talked to him before you texted back. He said he tried calling several times today. I hope he tries again . . . ." *Id.* at 50. Fifteen minutes later Mother texted, "We just got off the phone with him." *Id.* At trial, Mother initially testified that Father did not call Child on his birthday in 2016, but admitted after seeing these text messages that Father must have done so.

[13] On February 12, 2016, Grandmother texted Mother that Father had just been released from jail and was living with paternal grandparents. Mother replied,

> I know that [Father] has been released and in order for me to ensure [Child's] safety and stability, [Child] will not be able to visit with you guys down there for a while. You and [paternal grandfather] are more than welcome to visit [Child] up here [in Noblesville]. I'm sure you're aware of [Father] requesting an appearance in court with us over parenting time which we appeared for so he doesn't have any rights to parenting time for [Child]. Please understand that this isn't a grandparent issue, but a [Father] issue.

*Id.* at 52.  Despite what Mother stated in this text, there never was a court order entered restricting Father's parenting time.

[14]   On March 4, 2016, Grandmother texted Mother,

> I wish you would reconsider and let him [Child] come home with us.  His second family misses him terribly.  I know that you and [Father] are having trouble communicating, and he hangs up, [Father] and I have talked about this extensively. His feelings are you can not [sic] talk to him without talking down to him in a demeaning manner. . . .  Not sure if you know this, [Father] will be having surgery on the 14th for a double hernia.  He has been suffering through this for many months.  He will be glad to get it taken care of so he can get back to work.

*Id.* at 55.  Mother responded, "I need you to understand that at this point I'm not okay with [Father] talking to or seeing [Child], however I'm fine with you talking to him and visiting him in Noblesville."  *Id.*

[15]   On March 14, 2016, Grandmother texted Mother, "Would you let [Child] call [Father] tonight?  He is in recovery after a pretty painful surgery."  *Id.* at 57.  Mother responded,

> [Child] has never asked me if he can call [Father], so there's absolutely no reason for [Child] to call him.  Please stop asking me if [Child] can talk to [Father], I have been very direct with you about why [Child] is not to have any contact with [Father] and I'm going to tell you for the last time.  [Father] is NOT a good role model for [Child] and that [Father] has a lot of areas in his life that he needs to improve on before being coming in contact with children.  If you want to talk to [Child], feel free to call him while [Father] is not around.

*Id.* at 57-58.

[16]  On March 29, 2016, Grandmother texted Mother that Father had moved into his own place and asked if Child could visit and stating that Father "won't see or talk to him per your request." *Id.* at 58. Still, Child did not resume visitation with paternal grandparents, although they continued attending sports activities in Noblesville; Father never attended these events. On June 28, 2016, Mother explicitly informed Grandmother, "I don't think it's a good idea for [Child] to visit you guys down there . . . ." *Id.* at 63.

[17]  On August 18, 2016, Stepfather filed a petition to adopt Child, which Father contested. During the year prior to the filing of the adoption petition, Father paid $3,189.74 in child support toward his total obligation of $3,380. All but $222.00 of that amount was from tax intercepts. In the year prior to that, from August 2014 to August 2015, Father regularly paid weekly child support. As mentioned in one of Grandmother's texts above, he had a severe hernia in the summer of 2015 but was unable to have it operated on until March 2016 due to lack of insurance and he had an extended recovery period thereafter; Mother does not dispute that Father had a hernia and surgery to repair it. Father claimed his hernia and post-surgery recovery impacted his ability to work. In June 2016, Father began working steadily as a cook and began having child support regularly withdrawn from his paycheck beginning in August 2016.

[18]  The trial court held a hearing on July 26, 2017 to address whether Father's consent to the adoption was required, at which Father appeared and

participated. On August 18, 2017, the trial court entered an order with findings and conclusions stating that Father's consent to the adoption was not required. The court found that Father had failed to support Child during three separate periods: from December 2011 to December 2012, during his incarceration from January 2013 to August 2014, and from August 2015 to August 2016. The court also found that Father had failed to significantly communicate with Child in the year preceding the filing of the adoption petition.

[19] On September 6, 2017, the trial court held a final hearing to address whether Child's adoption by Stepfather would be in Child's best interests. Father and his attorney appeared at the hearing. At the outset, counsel for Stepfather moved to exclude Father from the courtroom. Father's attorney objected. The trial court overruled the objection, based on its order of August 18, 2017, and ordered Father and his attorney to leave the courtroom. After hearing testimony from Stepfather and Mother, the trial court granted the adoption petition. Father now appeals.

## Analysis

[20] Father contends there was insufficient evidence to support the trial court's conclusion that his consent to Child's adoption by Stepfather was not required. The granting of an adoption petition over a natural parent's objection results in termination of parental rights and implicates the traditional right of parents under the Fourteenth Amendment to the United States Constitution to establish a home and raise their children. *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). "A parent's interest in the care, custody, and control of his or her

children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000)).

[21] We will reverse a trial court's decision in an adoption proceeding only if the evidence leads to one conclusion and the trial court reached the opposite conclusion. *E.W. v. J.W.*, 20 N.E.3d 889, 894 (Ind. Ct. App. 2014), *trans. denied*. "We do not reweigh evidence, and we consider the evidence most favorable to the decision together with reasonable inferences drawn from that evidence." *Id.* We also recognize that trial courts are in the best position to judge facts, determine witness credibility, ascertain family dynamics, and evaluate the parents and their relationship with their child or children. *Id.*

[22] The trial court here entered findings of fact and conclusions thereon sua sponte. In such a case, we apply a two-tiered standard of review, determining: (1) whether the evidence supports the findings of fact and (2) whether the findings support the judgment. *Id.* We will set aside the trial court's findings or judgment only if they are clearly erroneous. *Id.* "A finding of fact is clearly erroneous if the record lacks evidence or reasonable inferences from the evidence to support it." *Id.* When findings are entered sua sponte, they control only as to the issues upon which the court has found, but they do not otherwise affect our general judgment standard of review, and we may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court. *C.B. v. B.W.*, 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), *trans. denied*.

Indiana Code Section 31-19-9-8(a)(2) provides that a biological parent's consent to adoption is not required if, among other possibilities:

> A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
> > (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
> >
> > (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

Because the statute is written in the disjunctive, the existence of any of the listed circumstances would provide sufficient reason to dispense with consent. *In re O.R.*, 16 N.E.3d at 973. A party seeking to adopt bears the burden of proving by clear and convincing evidence that a noncustodial parent's consent is not required. *In re Adoption of M.S.*, 10 N.E.3d 1272, 1279 (Ind. Ct. App. 2014).

### *A. Support*

We first address the trial court's finding that there were three separate year-long-plus periods, totaling forty-two months, in which Father failed to provide for Child's care and support. Stepfather had the burden of proving that Father had the ability to make child support payments but that Father knowingly failed to do so. *See In re Adoption of K.F.*, 935 N.E.2d 282, 288 (Ind. Ct. App. 2010), *trans. denied*.

"[The ability to pay] cannot be adequately shown by proof of income standing alone. To determine that ability, it is necessary to consider the totality of the circumstances. In addition to income, it is necessary to consider whether that income is steady or sporadic and what the non-custodial parent's necessary and reasonable expenses were during the period in question."

*Id.* (quoting *In re Adoption of Augustyniak*, 508 N.E.2d 1307, 1308 (Ind. Ct. App. 1987), *trans. denied*).

[25] The first period of nonsupport found by the trial court was from December 2011 to December 2012. During that time frame, Father paid $620 in support toward a total annual obligation of $3,380. Even if this constituted a gross underpayment of support, there is no evidence whatsoever in the record of the totality of the circumstances regarding that year of underpayment. All that is known is that the original child support calculation was based on Father's job as a machinist but that he lost that job sometime thereafter for unknown reasons. Stepfather's attorney did not question Father about this time period, though he did about the other two periods in question. It was not Father's burden to present evidence explaining why he did not pay the full amount of support; it was Stepfather's burden to prove that Father was able to pay it. Thus, although the trial court found that Father was able to pay the full amount of support for that year, there is a lack of evidence to support that finding, and it is clearly erroneous. *Cf. In re M.S.*, 10 N.E.3d at 1272 (holding there was sufficient evidence biological mother had ability to pay support, despite claims of high medical expenses and loss of business, where there was evidence mother

still maintained gainful employment, lived in and paid to redecorate house purchased by grandmother, and had multiple pets).

[26] The second period of nonpayment was during Father's incarceration from March 2013 through July 2014. Although Father's child support obligation was reduced to $0 during his incarceration, the trial court concluded nonetheless that Father had a duty to continue paying some support, based on approximate monthly income of $30 from a prison job. We conclude that the trial court's decision to essentially penalize Father for not paying any child support while incarcerated, despite having had his support obligation reduced to $0, is contrary to the policies underlying our supreme court's decision in *Clark v. Clark*, 902 N.E.2d 813 (Ind. 2009). In that case, the court held that incarceration may be considered a substantial change in circumstances justifying modification of a child support order. *Clark*, 902 N.E.2d at 817. The court stated:

> Proscribing the consideration of incarceration as a substantial change in circumstances justifying the modification of a child support order is not in the best interest of children. When released, most obligated parents face the twin barriers of large arrearages and difficulty finding employment. Such a situation makes it more likely that the newly-released obligated parent will face jail time as a result of non-payment of child support or participate in the underground economy—once again straining family relationships, if not jeopardizing public safety.

*Id.* Here, the trial court's decision to effectively impose a retroactive child support obligation upon Father while incarcerated put the ultimate strain upon

a family relationship, as it was used as partial justification to terminate his parental rights. Its finding that Father's nonpayment of support while incarcerated obviated the need for his consent to Child's adoption is clearly erroneous, as there is insufficient evidence he had the ability to pay during that time.

[27] Finally, the trial court found Father knowingly failed to pay support when able to do so between August 2015 and August 2016. During that time, Father paid $3,189.74 in child support toward his total obligation of $3,380.00, and all but $222.00 of that amount was from tax intercepts. Although the total amount of these payments nearly equaled Father's total obligation for the year, Mother and the trial court discount the amount that resulted from tax intercepts because they were not, strictly speaking, "voluntary" payments. Father notes that he was again incarcerated for a part of that time period, and argues that he had a hernia and resulting surgery and recovery that prevented him from working for much of the rest of the time period.

[28] Those arguments aside, the fact that much of the support paid in that time period came from tax intercepts does not mean that it should have been disregarded by the trial court. Such intercepts would constitute support for purposes of any criminal action for nonsupport of a dependent. *See Long v. State*, 716 N.E.2d 51, 54 (Ind. Ct. App. 1999). Additionally, if the tax intercepts had caused more to be paid in child support than Father owed for the one-year period, he may have been entitled to reimbursement of that amount as an involuntary overpayment of child support. *See Matson v. Matson*, 569 N.E.2d

732, 734 (Ind. Ct. App. 1991). Regardless of the form in which support was paid from August 2015 to August 2016, it was paid and the fact that most of it came from tax intercepts should not have been held against Father when considering whether his consent to Child's adoption was required. The trial court's finding that Father knowingly failed to provide for Child's support during this time period is clearly erroneous.

### B. Communication

We now turn to whether there is sufficient evidence that Father failed to communicate significantly with Child, when able to do so and without justifiable cause, for the year preceding the filing of the adoption petition. It is well-settled that, "'Efforts of a custodial parent to hamper or thwart communication between a parent and child are relevant in determining the ability to communicate.'" *E.W.*, 20 N.E.3d at 896-97 (quoting *In re Adoption of A.K.S.*, 713 N.E.2d 896, 899 (Ind. Ct. App. 1999), *trans. denied*). Also, "It has been held that visitation by paternal family members may constitute indirect communication by a non-custodial father." *In re Adoption of S.W.*, 979 N.E.2d 633, 641 (Ind. Ct. App. 2012).

The evidence is clear and undisputed that Mother made efforts to curtail, and then completely terminate, Father's ability to communicate with Child in the year preceding the filing of the adoption petition. At trial, Mother did not deny what is reflected in the text messages between her and Grandmother: that she wanted Father to have no communication with Child beginning with his November 2015 incarceration, and no contact at all with Child when he was

released from incarceration in February 2016.[4] It required begging on Grandmother's part for Mother to allow Father to make a brief phone call to Child on his birthday in January 2016. After Father's release from incarceration, Mother terminated the previous arrangement—in place since Child's infancy—whereby Child frequently spent weekends with Grandmother, which facilitated visitation between Father and Child even when Mother refused to allow Child to spend time alone with Father at his own residence. On occasion, Father did phone Mother to attempt to arrange some communication or visitation with Child. Unfortunately, these phone calls would disintegrate into arguments when Mother insisted that Father had to, for example, undergo counseling before he could see or talk to Child.

[31] Mother and the trial court discounted her clear efforts to hamper communication between Child and Father by essentially claiming that he should have expended more effort to force such communication, through legal channels or by simply, for example, showing up at Child's sporting events in Noblesville unannounced and without Mother's invitation and in contravention of Mother's clearly-expressed desire that Father have no contact with Child. We conclude, however, that Father's failure to fight Mother more aggressively with respect to communicating with Child does not mean he lacked justifiable

---

[4] Because the statutory period of required noncommunication is at least one year, we need not examine the three-to-four-month time period between August and November 2015.

cause for failing to communicate or that he was practically able to communicate.

[32] Father's parenting time rights were never curtailed by any court order. We do not wish to be overly critical of Mother's natural desire to protect Child, and there is no question that Father has been far from an ideal parent. However, there are established legal procedures to follow if a custodial parent believes restriction or complete cessation of a noncustodial parent's parenting time is warranted. *See* I.C. § 31-14-14-1(a) (applying to paternity cases and stating, "A noncustodial parent is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time might: (1) endanger the child's physical health and well-being; or (2) significantly impair the child's emotional development").[5] Those procedures were not followed here. A custodial parent should not be able to unilaterally limit, place conditions on, or completely terminate a noncustodial parent's parenting time, and then successfully assert in an adoption proceeding that the noncustodial parent was able to communicate with the child but failed to do so without justifiable cause. In sum, we conclude the trial court clearly erred in finding that Father failed to significantly communicate with Child, when able to do so and without justifiable cause, in the year preceding the filing of the adoption petition.

---

[5] A noncustodial parent's conviction for child molesting or child exploitation creates a rebuttable presumption that parenting time may be curtailed or, if granted, supervised. I.C. § 31-14-14-1(c) & (d). Father has not been convicted of either offense.

## Conclusion

The trial court's findings that Father failed to support Child for at least a year when able to do so, and that he failed without justifiable cause to communicate significantly with Child for at least a year when able to do so, are clearly erroneous. Thus, it erred in ultimately concluding that Father's consent to Child's adoption by Stepfather was not required.[6] We reverse the granting of Stepfather's adoption petition.

Reversed.

Vaidik, C.J., and Pyle, J., concur.

---

[6] Given our resolution of this issue, we need not address Father's alternative argument that he was denied due process when the trial court precluded him and his attorney from attending or participating in the hearing that addressed whether adoption was in Child's best interests.