Robb, Judge, dissenting.
I respectfully dissent.
[36] I agree with the majority that it is a bedrock principle of our criminal justice system that the Fifth Amendment protects a person from being involuntarily called as a witness against himself in a criminal case and also protects a person from having the refusal to testify in a civil case used against him in subsequent criminal proceedings.
*1091 Lefkowitz v. Turley , 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) ; see slip op. at ¶¶ 14-15. As a practical matter, I believe the majority opinion is written with too broad a brush: if a parent in a future CHINS/termination case says he or she did not do the act which precipitated DCS involvement in the family and refuses to participate in treatment designed to address the issue for fear of criminal reprisals, then DCS could not prove a termination case. It would encourage refusal to participate in treatment.
[37] Moreover, in focusing on the possible criminal repercussions of an admission, the majority fails to acknowledge that a civil defendant who chooses to avail himself of the Fifth Amendment privilege "does so at his peril" because the Fifth Amendment does not forbid adverse inferences against a party to a civil proceeding who refuses to testify in that proceeding. Baxter v. Palmigiano , 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ; see also Hardiman v. Cozmanoff , 4 N.E.3d 1148, 1152 (Ind. 2014). In its January 31, 2017, Order on Matters Taken Under Advisement; Parental Participation and Visitation, the trial court noted as much:
Certainly, as Indiana courts have stated, [Father] does not leave his constitutional rights at the door when he enters sex offender treatment and may refuse to answer questions which he believes might be used against him. Should he invoke his Fifth Amendment right; however, the Court may also infer what his answer might have been and whether or not he has successfully completed the treatment program.
[38] Appendix of Appellant/Father, Volume II at 76-77. In other words, the Fifth Amendment shields Father from being compelled to give possibly incriminating statements but it does not shield him from the consequences of asserting that right. Here, the consequences included the possibility of termination of his parental rights for failing to participate in meaningful therapy.[8]
[39] R.W. testified at the CHINS fact-finding hearing and again at the termination fact-finding hearing that she was sexually abused by Father when she was a minor living in the home. Father denied the abuse and despite polygraph results that indicated he was being deceptive regarding this issue, refused to participate in sex offender treatment as a part of the family reunification plan. The trial court was in the position of determining the credibility of the witnesses and specifically found R.W.'s testimony about sexual abuse by Father to be credible. App. of Appellant/Father, Vol. II at 112. In addition, the trial court was entitled to draw an adverse inference from Father's invocation of the Fifth Amendment to avoid the requirements of the treatment program.
*1092 [40] However, even accepting Father's position that he should not have been required to take a polygraph test or admit to wrongdoing and making no negative inference from his invocation of the Fifth Amendment, the essence of this case is that which we often encounter: Father says he did nothing wrong and R.W. says otherwise. The trial court found R.W. to be a more credible witness than Father and again, determining credibility and weighing conflicting evidence is the trial court's province. In re E.M.L. , 103 N.E.3d 1110, 1115 (Ind. Ct. App. 2018), trans. denied . Conceding to Father the Fifth Amendment issue, we are left with Father's denial, R.W.'s testimony, a court order that did not specifically require an admission of wrongdoing as a requirement for reunification, Father's failure to participate in treatment in even a limited way, and the trial court's credibility determination. There are safety concerns that have not yet been addressed due to Father's minimal compliance and lack of engagement and Mother's unwillingness to acknowledge and implement a plan to address the safety concerns. Therefore, the trial court's determination there has not been substantial progress towards reunification is not clearly erroneous and I would affirm the trial court's judgment.

The trial court found during the CHINS proceeding that the DCS recommendation that Father participate in sex offender treatment was reasonable because the court had determined by a preponderance of the evidence that Father had sexually abused R.W. when she was a minor. See id. at 76. DCS was required to provide options for sex offender treatment programs within sixty miles of Father's residence and to make a referral to Father's chosen program. See id. at 77. The trial court's order did not require Father to admit to the truth of the sexual abuse allegations and it did not require Father to participate in a specific therapy program that would mandate an admission of guilt; rather, it required him to participate in a sex offender treatment program of his own choosing. Several states have concluded that there is a distinction between a court-ordered case plan that mandates admission of guilt either through a direct admission or participation in a treatment program that specifically mandates an admission for family reunification and one that requires meaningful therapy. See Matter of A.D.L. , 402 P.3d 1280, 1285-86 (Nev. 2017) (citing cases from other jurisdictions).